**AT & T COMMUNICATIONS OF THE SOUTHWEST, INC., Plaintiff,**

v.

**CITY OF DALLAS, Defendant.**

**No. 3:98–CV–003–R.**

United States District Court,
N.D. Texas,
Dallas Division.

June 8, 1998.

---

584

Andrew W. Austin and George H. Tarpley, Sheinfeld, Maley & Kay, P.C., Austin, TX, for AT & T.

Ronald D. Stutes, Assistant City Attorney, for City of Dallas.

Robert Edwin Davis, Weston C. Loegering, D. Randall Johnson, Hughes & Luce, LLP, Dallas, TX, and Barbara Hunt, Southwestern Bell Telephone Company, Dallas, TX, for proposed intervenor, Southwestern Bell Telephone Co.

## MEMORANDUM OPINION

BUCHMEYER, Chief Judge.

This opinion concerns the Federal Telecommunications Act of 1996, which was passed to end the monopolies in local telephone services and to benefit consumers by fostering competition between telephone companies in cities throughout the United States—including Dallas.

In this case, AT & T Communications ("AT & T") plans to compete by using its existing fiber optic facilities to provide a new local telephone service known as "AT & T Digital Link" ("ADL") to Dallas customers. However, the City of Dallas ("City") claims that before AT & T can offer this service, it must first complete an extensive and detailed, eighteen-page franchise application, and must agree to pay a fee that equals four percent of its revenues from any business it conducts in Dallas, and must meet certain other requirements.

This opinion holds that Dallas may require AT & T to obtain a franchise in order to use City rights-of-way for the provision of ADL. The City may not, however, condition this franchise on anything other than AT & T's agreement to comply with the City's reasonable regulations of its rights-of-way and the fees for use of those rights-of-way. Dallas does not have the authority under state or federal law to require a wide-ranging franchise application, to impose conditions on a franchise that are unrelated to the telecommunications provider's use of the City's rights-of-way, or to impose fees that are unrelated to use of the rights-of-way.

AT & T's Motion for Preliminary Injunction is therefore **GRANTED,** and the City's Motion to Dismiss is **DENIED.**

## I. Factual and Statutory Background

Prior to 1996 local telephone services were provided by monopolies in all cities in Texas and in virtually all other states. The telecommunications companies holding these monopolies are referred to as "incumbent local exchange carriers" or "incumbent LECs." In Dallas, the exclusive carrier was Southwestern Bell Telephone Company ("SWBT").

There were no such monopolies in the market for long distance telephone services, and AT & T has been providing long distance services in Dallas for a number of years. In 1985 the City adopted Ordinance No. 18613 ("the Ordinance") which grants AT & T a fifteen-year license to use certain portions of City right-of-way for physical facilities to support its long distance services.[1] These physical facilities are comprised of small fiber-optic cables in an underground conduit which occupies a strip of land approximately three-feet wide and 5.6 miles long. In the Ordinance the City regulates AT & T's con-

struction, maintenance, and use of those facilities, and provides for a fee to compensate the City which "represents the value ... of the public right-of-way ... used by AT & T for the construction of new facilities, ... as well as for the use of public right-of-way ... for existing facilities."[2] Because AT & T was not allowed to offer local telephone service when the Ordinance was enacted, the Ordinance contains a specific provision that excludes the use of these facilities for local exchange telephone service.[3]

The Federal Telecommunications Act of 1996[4] ("FTA") made sweeping changes to the industry and ended the monopolies in local telephone service. It is entitled: "An Act to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies."[5] Congress sought to foster immediate competition by stripping away many of the legal and economic impediments to entry into the local telephone markets.

One way that Congress intended to bring about this demonopolization was to encourage viable competition with incumbent LECs by allowing new market entrants to use the incumbent's existing networks and facilities by reselling the incumbent's local services.[6] For example, in Dallas AT & T purchases SWBT's services, much like an individual telephone consumer would, but on a wholesale basis. AT & T then re-sells these local services to its customers. In providing local service through this means, AT & T uses no AT & T owned or operated facilities, but rather SWBT continues to own, operate and maintain all of its own facilities.

---

**1.** *See* Ex. A to AT & T's Compl., Ordinance 18613.

**2.** *Id.* § 9.

**3.** *See id.* § 1.

**4.** Pub.L. No. 104–104, 110 Stat. 56 (codified at 47 U.S.C. § 151 *et seq.* (Supp.1998)).

**5.** *Id.,* 110 Stat. at 56.

**6.** *See* 47 U.S.C. § 251(c)(4). The two other means by which a telecommunications provider

can enter a local telephone market are the construction by the entrant of new local network facilities that are interconnected with the existing networks of incumbent LECs, *id.* § 251(c)(2), and the purchase by entrants of access to the unbundled "elements" of the incumbents' existing networks, *id.* §§ 251(c)(3), 252(d)(1). *See also Iowa Util. Bd. v. FCC,* 109 F.3d 418, 421–22 (8th Cir.1996) (discussing purposes and mechanisms of FTA).

Another important provision of the FTA prohibits barriers to entry into local telephone markets. In § 253(a) Congress preempts all state and local statutes, regulations, and other legal requirements which "prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." There are only two limitations on this provision. First, § 253(b) provides that states maintain the authority to regulate to "preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers." Second, § 253(c) allows states or local governments to "manage the public rights-of-way" and "require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way."

In November of 1996, pursuant to the FTA and the Texas Public Utilities Regulatory Act ("PURA"), AT & T applied for a Certificate of Operating Authority ("COA") from the Texas Public Utilities Commission ("PUC") to operate as a provider of local exchange service in Dallas and other localities throughout Texas. The PUC conducted a thorough review of AT & T's qualifications, and required AT & T to provide detailed financial and technical information, information relating to the types of services to be provided, and information about the company's organizational structure. On June 5, 1997, the PUC granted AT & T a COA to provide local services.[7]

As part of its entry into the Dallas local telephone market, now authorized by the FTA and the State COA, AT & T plans to offer AT & T Digital Link ("ADL") to some of its business customers. The vast majority of facilities needed to provide this service will be SWBT lines, to which AT & T will obtain access through arrangements with SWBT. For certain customers, however, it will be necessary to use the facilities owned by AT & T that are governed by the Ordinance (and which previously have only been used for long distance services). AT & T will not need to do any construction or modification of the existing facilities in order to route ADL traffic through them, and would like to begin to offer the service by the end of the first quarter or beginning of the second quarter of 1998.

AT & T approached Dallas and requested that the City allow the company to use the facilities governed by the Ordinance to provide ADL. AT & T offered to pay the City (in addition to compensation for the value of the rights-of-way as required by the Ordinance) a fee of four percent of the gross revenues for ADL traffic carried through those facilities.

The City refused AT & T's request and insisted that to use the existing facilities for ADL, AT & T must apply for and obtain a franchise agreement from the City which would cover all of AT & T's telephone business in Dallas.[8] The application for the franchise agreement is extensive and burdensome, according to AT & T. It requires, among other things, that AT & T provide detailed ownership and control information, character qualifications, information relating to other present and past telecommunications systems holdings, financial information, and financial projections through 2007 concerning AT & T's expected customers, revenues and expenses. Much of this information was already reviewed by the Texas PUC when AT & T applied for its COA, and some of the information requested exceeds what the PUC required.

In addition, the form franchise ordinance that the City insists upon contains numerous conditions that AT & T alleges are inconsistent with the FTA and the Texas PURA. These conditions include requirements that AT & T: (1) provide prior notification of all services offered in the City; (2) refuse to

---

7. See Ex. 4 to AT & T's Mot. Prelim. Inj.

8. See Ex. B to the Complaint, which contains the City's letter responding to AT & T's request, a copy of the franchise application, and a copy of the form franchise ordinance, which is an ordinance adopted on November 18, 1997, granting a franchise to Teligent, LLC, another telecommunications provider. The City stated in its letter that the franchise AT & T must obtain would "need to be similar to the enclosed example."

provide any services or facilities for resale to any person or company that does not also have a City ordinance; (3) provide ubiquitous services throughout the City; (4) be capable of providing service to end users within six months of the issuance of the franchise; (5) permit the City to use, without charge, one duct or subduct of each and every AT & T conduit in the City; (6) dedicate a "single dark fiber pair throughout the portion of the telecommunications system owned by [AT & T]" to the exclusive use of the City; (7) permit potentially detailed audits of AT & T's financial and other records; and (8) notify the City of all communications with the FCC, the SEC, and the PUC that relate to services in Dallas.

Finally, the form franchise also requires AT & T to pay Dallas a fee equal to four percent of its gross receipts for *all* of AT & T's operations in Dallas. The form franchise includes a list of twenty five potential revenue streams as examples of things that are subject to the fee. This list includes AT & T's long distance revenues, as well as receipts from the resale of SWBT services. This four percent fee is in no way tied to AT & T's use of City rights-of-way.

AT & T subsequently filed this suit, arguing that, "[i]n short, the City is attempting to leverage AT & T's proposed use for ADL of an isolated portion of the City's right-of-way, which AT & T already otherwise has the right to use and is paying for, into an excuse for unlawfully regulating AT & T's provision of local service throughout Dallas, a role that the Texas Legislature took away from Texas cities and gave to the PUC more than 20 years ago," and that the FTA assigns to states, not to municipalities.[9] The City filed a motion to dismiss, and AT & T filed a motion for preliminary injunction. The Court held a hearing on these matters on April 9, 1998.

In formulating this decision the Court was greatly assisted and informed by the recent decision of Judge Sam Sparks in *AT & T Communications of the Southwest, Inc. v.* *City of Austin, Texas.*[10] In that case AT & T challenged an Austin ordinance which required municipal consent before entering the local telephone market. The Austin ordinance imposed several conditions on AT & T and other telecommunications providers entering the market, including a non-refundable $850 application fee, quarterly franchise fees for use of the City's rights-of-way, disclosure of detailed financial and organizational materials, information on state and federal certificates of operating authority and franchises in other Texas municipalities, and continuing disclosure of various types of information.[11] Unlike in Dallas, AT & T stated that it had no plans at that time to use any of Austin's rights-of-way for AT & T facilities related to local service. Rather, AT & T would use SWBT's existing facilities by reselling SWBT services and by obtaining unbundled network capabilities from SWBT.[12]

AT & T brought claims under the FTA, the PURA, and the State and federal Constitutions. It argued that Austin had no authority to require a telecommunications provider that does not use city rights-of-way for its own facilities to obtain municipal consent before offering local service. Rather, municipalities can only require consent for and otherwise regulate the installation, maintenance, and repair of physical facilities placed in the city's rights-of-way. Austin responded that cities have legitimate gatekeeping authority to regulate telecommunications service providers for the health, safety and welfare of their citizens, and that cities are required to treat all entities entering the local service market in a competitively neutral and nondiscriminatory way. Austin also asked the court to dismiss based on exhaustion of administrative remedies and the primary jurisdiction doctrine, or to abstain under the Pullman abstention doctrine. Judge Sparks denied the motion to dismiss and granted a preliminary injunction which prohibits the City of Austin from enforcing the contested ordinance. Judge Sparks based his decision on the conclusion that under the FTA and the PURA a city cannot regulate a

---

**9.** AT & T's Br. Supp. Mot. Prelim. Inj. at 12.

**10.** 975 F.Supp. 928 (W.D.Tex.1997).

**11.** *See id.* at 934–35.

**12.** *See id.* at 934.

local service provider in a way that is unrelated to the management of and compensation for the provider's use of the city's public rights-of-way.[13]

## II. Discussion: City's Motion to Dismiss

The City of Dallas argues that the Court should dismiss AT & T's claims under Rule 12(b)(1) for lack of subject matter jurisdiction. While both parties agree that 28 U.S.C. § 1331 provides this Court with jurisdiction, the City argues that the Court should nevertheless defer to the Federal Communications Commission ("FCC"), the administrative agency charged with enforcing the FTA, based on AT & T's failure to exhaust administrative remedies, or on the primary jurisdiction doctrine. Both doctrines are intended to preserve and promote the proper relationship between the courts and the agencies responsible for administering particular regulatory functions.[14] In this case jurisdiction lies properly with this Court.

### A. Failure to Exhaust Administrative Remedies

 First, the City argues that AT & T has failed to exhaust available administrative remedies by proceeding in federal court rather than before the FCC. Exhaustion is only required when the original claim could be brought *solely* in the administrative agency.[15] While FTA § 253(d) does grant the FCC jurisdiction to consider whether a state or local statute or legal rule is preempted by the FTA, there is no indication that Congress intended to grant the FCC *exclusive* jurisdic-

tion.[16] Rather, it seems that Congress intended § 253(d) to provide a mechanism by which the Commission itself could challenge state or local rules without relying on a private actor to bring a claim.[17] Furthermore, as Judge Sparks pointed out, "[w]hen Congress intended to confer exclusive jurisdiction with the FCC over claims arising under other provisions of the FTA, it made it's intentions clear in the statute."[18] The lack of such a provision in § 253 makes it clear that Congress did not intend for the FCC to have exclusive jurisdiction over claims arising under this section. There is thus no requirement that potential administrative remedies be exhausted before bringing a claim in federal court.

### B. Primary Jurisdiction

 The primary jurisdiction doctrine applies to claims which are properly brought in a court, but which depend on resolution of issues within an agency's special competence or expertise.[19] In such cases the judicial process is stayed or dismissed pending the referral of those issues to the administrative body. Whether the primary jurisdiction doctrine applies is a matter of the court's discretion, and the court must balance the parties' interests in a speedy resolution of their claims against the benefits of obtaining the agency's views.[20]

The City argues that AT & T's claims involve policy issues which are best resolved by the FCC. The City sees tension between § 253(a), which prohibits state and local law interference with the provision of telecommu-

---

13. *See id.* at 942–43.

14. *See United States v. Western Pacific R.R. Co.,* 352 U.S. 59, 63, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956).

15. *See id.*

16. FTA § 253(d) states: "If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency."

17. *See AT & T v. Austin,* 975 F.Supp. at 939; *Ameritech Advanced Data Servs., Inc. v. Public Serv. Comm'n,* No. 97–1516, 1998 WL 176735, at *3 (Wis.Ct.App. Apr.16, 1998).

18. *AT & T v. Austin,* 975 F.Supp. at 938 (citing 47 U.S.C. §§ 255(f), 613(h) ("The Commission shall have exclusive jurisdiction with respect to any complaint under this section.")).

19. *See Western,* 352 U.S. at 63–64, 77 S.Ct. 161.

20. *See id.* at 64, 77 S.Ct. 161; *Wagner & Brown v. ANR Pipeline Co.,* 837 F.2d 199, 201 (5th Cir.1988); *Gulf States Util. Co. v. Alabama Power Co.,* 824 F.2d 1465, 1473 (5th Cir.1987); *AT & T v. Austin,* 975 F.Supp. at 938.

nication services, and § 253(c), which maintains city and state authority to regulate their rights-of-way. The City argues that its contested franchise requirement is necessary to comply with § 253(c)'s requirement that it manage its rights-of-way and obtain fees for their use in a "competitively neutral and nondiscriminatory" manner. It states that the same form franchise is required of all local service providers. Thus, if AT & T does not have to obtain a franchise with the same conditions it will amount to a "different and special deal" that would violate § 253(c)'s competitive neutrality provision. AT & T responds that that is not the true issue here. Rather, it's claims require a straightforward preemption analysis, which is traditionally within the purview of the courts.

■ While the issue raised by the City may be related to AT & T's claims, its resolution involves construction of the FTA's provisions, and not necessarily policy determinations. The Court is as well equipped as the Agency to conduct this statutory analysis and to determine if Dallas's proposed franchise requirement is preempted by the federal law.[21] Also, the FCC has already issued opinions which set out its position on some of the issues raised in this case.[22] Therefore, it is not necessary to refer this case to the FCC to obtain its views. Finally, AT & T has a significant interest in swift adjudication of its claims to prevent substantial threatened harms, as discussed below. Referral to the FCC would lead to lengthy delays, primarily as a result of the Agency's requirement to issue notice and obtain public comments before ruling. AT & T's interest in speed outweighs any benefit that might be obtained by soliciting the FCC's opinion on the particular matters at hand.[23]

Dallas's Motion to Dismiss is therefore DENIED.

## III. AT & T's Motion for Preliminary Injunction

### A. Standard for Preliminary Injunction

■ To be entitled to a preliminary injunction, the Fifth Circuit requires that a movant carry the burden of persuasion on the following four elements: (1) a substantial likelihood of success on the merits of the movant's claims; (2) a substantial threat that movant will suffer irreparable injury if the injunction is not granted; (3) the threatened injury to the movant outweighs any harm that the other party might suffer if the injunction is entered; and (4) an injunction will not disserve the public interest.[24]

### B. Likelihood of Success on the Merits

AT & T claims that the City of Dallas's actions violate § 253(a) of the Federal Telecommunications Act of 1996 and exceed the City's powers under the Texas Public Utilities Regulatory Act as well as the supremacy clauses in the United States Constitution and the Texas Constitution. Section 253 provides:

(a) **In general**

No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

(b) **State regulatory authority**

Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this section, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

---

21. *See AT & T v. Austin,* 975 F.Supp. at 939 (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)); *Ameritech,* 1998 WL 176735, at *3.

22. *See, e.g., In re of TCI Cablevision of Oakland County, Inc.,* 9 Communications Reg. (P & F), 1997 WL 580831 (F.C.C.1997); *In re Classic*

*Telephone, Inc.,* 11 F.C.C.R. 13082, 1996 WL 554531 (F.C.C.1996).

23. *See AT & T v. Austin,* 975 F.Supp. at 939.

24. *Sierra Club v. City of San Antonio,* 112 F.3d 789, 793 (5th Cir.1997) (citing *Lakedreams v. Taylor,* 932 F.2d 1103, 1107 (5th Cir.1991)).

**(c) State and local government authority**

Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publically disclosed by such government.

Federal law therefore limits the scope of Dallas's authority to regulate telecommunications to two narrow areas: the "management" of city rights-of-way, and the requirement of fees for use of rights-of-way. The language of § 253 is straightforward. Absent explicit delegation by the state legislature,[25] cities do not have the more general authority to regulate to protect public safety and welfare, advance universal service and ensure quality—this is a function reserved to states by § 253(b), not to local governments.[26] Legislative history reveals that Congress's intent was to remove all barriers to entry in the provision of telecommunications services by preempting all state and local legal requirements that directly or indirectly prohibit market entry.[27] As the FCC has stated, "Congress intended primarily for competitive markets to determine which entrants shall provide the telecommunications services demanded by consumers, and by preempting under section 253 sought to ensure that State and local governments implement the 1996 Act in a manner consistent with these goals."[28] Municipalities therefore have a very limited and proscribed role in the regulation of telecommunications.

The Federal Communications Commission, the agency charged with implementing the FTA, has also interpreted § 253. In *TCI Cablevision*, the FCC found that there was no concrete dispute presented to be resolved under § 253, and it therefore declined to issue a declaratory ruling on whether the Troy city ordinance would violate that section. Nevertheless, the FCC stated that it wanted to take the opportunity to "address generally some issues related to section 253." It stated:

> We recognize that section 253(c) preserves the authority of state and local governments to manage public rights-of-way. Local governments must be allowed to perform the range of vital tasks necessary to preserve the physical integrity of streets and highways, to control the orderly flow of vehicles and pedestrians, to manage gas, water, cable (both electric and cable television), and telephone facilities that crisscross the streets and public rights-of-way. We have previously described the types of activities that fall within the sphere of appropriate rights-of-way management in both the Classic Telephone Decision and the OVS Orders, and that analysis of what constitutes appropriate rights-of-way management continues to set the parameters of local authority. These matters include coordination of construction schedules, determination of insurance, bonding and indemnity requirements, establishment and

**25.** *See AT & T v. Austin*, 975 F.Supp. at 940 & n. 10: "a State's authority to regulate under a federal statute necessarily includes the authority to delegate local regulation, including regulation for public health, safety, and welfare purposes, to local authorities. *See [Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 607–08, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991)].... Having said that, however, it appears that Congress did not anticipate that local governments would attempt to regulate telecommunications service providers for the public good." *See also Classic Tel.*, 11 F.C.C.R. 13082, at ¶ 40 (stating that cities can exercise general police power over local telephone service only if the state has delegated that power to the city). As discussed below, Texas law gives exclusive jurisdiction over regulation of telecommunications providers to the State PUC, and does not delegate any regulatory power to

municipalities except for management of their rights-of-way.

**26.** *See also TCI Cablevision*, 9 Communications Reg. at ¶ 106: "In addition, section 253(b)'s reservation to the States of authority over issues such as universal service, safety, and consumer protection appears to reflect Congress' view that an array of local telecommunications regulations that vary from community to community is likely to discourage or delay the development of telecommunications competition."

**27.** *See* Senate Conference Report on the Telecommunications Act of 1996, S. Rep. 104–230 (1996), 1996 WL 54191, at *277–81.

**28.** *Classic Tel.*, 11 F.C.C.R. 13082, at ¶ 25.

enforcement of building codes, and keeping track of the various systems using the rights-of-way to prevent interference between them.[29]

The FCC went on to conclude that it was concerned that Troy and other local governments appear to be reaching beyond traditional rights-of-way management to create "an unnecessary 'third tier' of regulation that extends far beyond the statutorily protected interests in managing the public rights-of-way." [30]

Texas State law imposes a very similar limit on the authority of municipalities to regulate telecommunications. In 1976 Texas enacted the Public Utility Regulatory Act which took away Texas cities' general police powers over telephone service and gave exclusive original jurisdiction to the Public Utilities Commission.[31] The PURA limits Texas cities to the authority to manage their rights-of-way and to receive compensation for their use. In describing the general powers of the Public Utility Commission of the PURA states:

(a) This title does not restrict the rights and powers of a municipality to grant or refuse a franchise to use the streets and alleys in the municipality or to make a statutory charge for that use.

(b) A franchise agreement may not limit or interfere with a power conferred on the commission by this title.[32]

The municipal authority to manage its rights-of-way is reiterated in the PURA section that specifically addresses the authority of the PUC to issue Certificates of Operating Authority to telecommunications providers: "This title does not restrict a municipality's historical right to control and receive reasonable compensation for access to the municipality's public streets, alleys, or rights-of-way or to other public property." [33] The limited exceptions to the exclusive jurisdiction of the State PUC thus parallel the local authority granted by the FTA: municipalities may only regulate the use of their rights-of-way and charge a fee for that use.

 The City's actions in this instance have overstepped this narrow grant of authority in several ways. The FTA and the Texas PURA do allow a city to require a company that has been granted a COA, and wants to use city rights-of-way, to obtain a franchise.[34] The City does not, however, have the authority to grant or deny that franchise based on its own discretion. Rather, granting a franchise may only be conditioned on a company's agreement to comply with the city's reasonable regulations of its rights-of-way and the fees for use of those

---

29. *TCI Cablevision*, 9 Communications Reg. at ¶ 103. See also *Classic Telephone*, in which the FCC stated that a city may only justify a local statute, regulation, or other legal requirement if it can show that the requirement is "an exercise of public rights-of-way management authority or the imposition of compensation requirements for the use of such rights of way." 11 F.C.C.R. 13082, at ¶ 40.

30. *TCI Cablevision*, 9 Communications Reg. at ¶¶ 102, 105.

31. *See* Tex. Util.Code Ann. § 52.002 (1998) ("the commission has exclusive original jurisdiction over the business and property of a telecommunications utility in this state"); *General Tel. Co. v. City of Perryton*, 552 S.W.2d 888, 891–92 (Tex. Civ.App.1977, writ ref'd n.r.e.).

32. Tex. Util.Code Ann. § 14.008.

33. *Id.* § 54.205. Because Dallas is a home rule city it also has the powers listed in Tex.Rev.Civ. Stat. Ann. § 1175 (App.1998), which include the prohibition of use of the rights-of-way by utilities

without an ordinance granting consent, payment of compensation for such use, agreement to any conditions provided by the ordinance, as well as the power to set franchise rates, to prescribe the services furnished, and to inspect the books and compel the attendance of witnesses from the utilities. These powers are specifically preempted, however, when they conflict with State statutes of general application or by the State Constitution. *See* Tex. Const. art. XI, § 5, "no [city] charter or ordinance under said charter shall contain any provision inconsistent with the Constitution of the State, or the general laws enacted by the Legislature of this State." *See also City of Corpus Christi v. Unitarian Church*, 436 S.W.2d 923, 927 (Tex.Civ.App.1968, writ ref'd n.r.e.).

34. *See* Tex. Util.Code Ann. § 14.008(a) ("This title does not restrict the rights and powers of a municipality to grant or refuse a franchise to use the streets and alleys in the municipality...."). This case does not present the issue, addressed in the *Austin* decision, as to whether a city may require a franchise from a local telecommunications provider who does not use *any* of the city's rights-of-way. *See AT & T v. Austin*, 975 F.Supp. at 934.

rights-of-way.[35] Dallas also does not have the power to require a comprehensive application and consider such factors as the company's technical and organizational qualifications to offer telecommunications services. State law and the FTA both assign that determination to the State PUC, and it may not be second-guessed by the City.[36]

 In addition, neither the FTA nor the PURA grant a city the authority to place conditions on a franchise for telecommunications services, other than those related to the use of rights-of-way. Many of Dallas's franchise requirements—such as the submission of a wide range of financial information on the company, the maintenance of detailed records subject to the City's approval, the provision of ubiquitous services, and the dedication of ducts and fiber optic strands to the City's exclusive use—like many of the pieces of information requested in the form franchise ordinance, are totally unrelated to use of the city's rights-of-way, and are thus beyond the scope of the City's authority.

 Finally, the City does not have the authority to impose fees on a telecommunications provider except as compensation for use of the City's rights-of-way. Dallas's requirement that AT & T must pay four percent of the gross revenue from *all* of its activities in Dallas contradicts the requirements of the FTA. The form franchise ordinance explicitly lists twenty-five potential sources of revenue as being subject to this fee requirement, including long distance services, and resale of SWBT services. Texas law is clear that a telecommunications provider has a statutory right to use public rights-of-way for long distance services with-

out any franchise from municipalities.[37] Furthermore, requiring AT & T to pay franchise fees on its revenue from the resale of SWBT services would amount to double billing. AT & T already pays SWBT for its pro-rata share of the franchise fees that SWBT pays to Dallas for its use of City rights-of-way. In sum, any fee that is not based on AT & T's use of City rights-of-way violates § 253(a) of the FTA as an economic barrier to entry. It is not necessary for the Court to determine at this time what *would* constitute a reasonable fee for the use of rights of way.

 The City tries to justify its actions as an attempt to regulate local services in a way that is "competitively neutral and nondiscriminatory," as required by § 253(c). It states that the franchise that has been offered to AT & T is essentially identical to that offered to every other telecommunications company since the enactment of the FTA. The City goes on to say that it cannot "fashion a unique telecommunications franchise that exactly fits every company."[38] This argument seems to boil down to an assertion that because some providers agreed to this ordinance and are now subject to it, all other providers must be subject to it as well. If the ordinance is found to be preempted by State and federal law, however, it makes no difference that other providers have agreed to the preempted ordinance.

In addition, being competitively neutral does not require cities to treat all providers identically and to ignore the significant distinctions among them. The most important and relevant distinction in this context is the different amounts of City rights-of-way that

---

**35.** The FCC agrees with this interpretation. In *Classic Telephone* it stated: "We do not believe that Congress intended to remove franchising authority from State and local governments. Nothing in the language of the 1996 Act or the legislative history reflects this intention. In fact, as discussed below, sections 253(b) and 253(c) recognized the authority of States and localities (including the Cities) to impose franchise requirements for certain purposes, and as such these sections preserve the authority of States and localities to deny a franchise application until such time the applicant complies with these permitted legal requirements." *Classic Tel.*, 11 F.C.C.R. 13082, at ¶ 28.

**36.** *See* Tex. Util.Code Ann. §§ 54.103, 14.008; 47 U.S.C. § 253(b); *Cf. AT & T v. Austin*, 975 F.Supp. at 941.

**37.** *See* Tex. Util.Code Ann. §§ 181.081, 181.082; *City of Weslaco v. General Tel. Co.*, 359 S.W.2d 260, 263 (Tex.Civ.App.1961, writ ref'd n.r.e.) ("A city may not interfere with [long distance] service and the service may be furnished without a franchise, as a matter of right.").

**38.** Resp. Mot. Prelim. Inj. at 9.

each company uses to provide its services.[39] It is not necessary to subject telecommunications providers to an extensive application and review process, and to impose numerous conditions on them to ensure that the City is managing its rights-of-way in a nondiscriminatory manner.

Finally, this neutrality argument fails in light of the fact that Congress expressly rejected a proposed "parity provision" that would have required a single fee be imposed on all carriers in a given area. The parity provision would have required a municipality to impose exactly the same fees (based on a flat rate or a percentage of revenue) on all telecommunications providers using the city's rights-of-way, regardless of how much of the rights-of-way they used.[40] Representative Stupak, who proposed the amendment that ultimately became § 253(c) commented on the proposed parity provision:

> Local governments must be able to distinguish between different telecommunication providers. The way the [parity] amendment is right now, they cannot make that distinction. For example, if a company plans to run 100 miles of trenching in our streets and wires to all parts of the cities, it imposes a different burden on the right-of-way than a company that just wants to string a wire across two streets to a couple of buildings. The [parity] amendment states that local governments would have to charge the same fee to every company, regardless of how much or how little they use the right-of-way or rip up our streets.[41]

Representative Stupak's colleagues ultimately agreed with him and the parity provision was defeated.[42] Therefore, Congress explicitly rejected the City's argument that § 253(c) requires cities to impose identical fees on all telecommunications providers.

In conclusion, AT & T has demonstrated that there is a substantial likelihood that it will succeed on the merits of its claims that Dallas's actions violate the FTA and the State PURA.

### C. Irreparable Injury, Balance of Harms, and Public Interest

 AT & T has shown that it is threatened with substantial irreparable injury if the injunction is not granted. Primarily, AT & T will lose revenues that it would have gained through the provision of ADL services. This potential revenue would be very difficult to calculate for the purposes of monetary damages, since ADL is a new service and AT & T is a new entrant in the Dallas local telephone market. AT & T fears it may loose existing customers, as well as potential new ones, if customers who want ADL are forced to change providers to obtain it. AT & T also states that it is threatened with the loss of good will if it cannot provide ADL and will suffer long-term negative effects from its delayed entry into the Dallas market.[43] The Fifth Circuit has held that "a finding of irreparable harm is appropriate even where economic rights are involved when the nature of those rights makes 'establishment of the dollar value of the loss ... especially difficult or speculative.'"[44] Therefore, AT & T has met its burden with respect to irreparable injury.

 If AT & T were to begin offering ADL service without Dallas's consent, it would be subject to criminal penalties under

---

39. Cf. TCG Detroit v. City of Dearborn, 977 F.Supp. 836, 840 n. 1 (E.D.Mich.1997).

40. H.R. 1555, 104th Cong. § 243(e), 141 Cong. Rec. H8425–06, H8427 (daily ed. Aug. 4, 1995).

41. 141 Cong. Rec. H8460–01, H8460 (daily ed. Aug. 4, 1995).

42. See id. at H8477; see also TCG Detroit, 977 F.Supp. at 840 n. 1 ("the parity provision was defeated because it did not allow a local government to distinguish between providers and impose a 'fair and reasonable rate' to providers based on their use of the right-of-ways").

43. See, e.g., Iowa Util. Bd. v. FCC, 109 F.3d 418, 426 (8th Cir.1996); Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 552 (4th Cir.1994).

44. Allied Mktg. Group, Inc. v. CDL Mktg., Inc., 878 F.2d 806, 810 n. 1 (5th Cir.1989) (quoting Mississippi Power & Light Co. v. United Gas Pipe Line Co., 760 F.2d 618, 630 n. 12 (1985)); see also Lakedreams v. Taylor, 932 F.2d 1103, 1109 (5th Cir.1991); AT & T v. Austin, 975 F.Supp. at 942.

Dallas City Code § 43–117(a).[45] It is not necessary for AT & T to expose itself to such penalties to be entitled to challenge the City's requirements.[46] It is also not necessary, as the City argues, for AT & T to comply with the city's onerous, and potentially illegal franchise requirements as it awaits a decision on the merits of its claim.[47] Indeed, the City has demonstrated in this very Court that in such circumstances the City would argue for dismissal based on mootness.[48]

The balance of potential harms in this case tips in favor of granting an injunction. The only threatened harm to the City is the loss of franchise fees it has demanded. These could easily be recouped if the City ultimately prevails on the merits. The legitimate interest of the City in managing its rights-of-way can be protected without forcing AT & T to go through the proposed franchise process by requiring AT & T to comply with the provisions of Ordinance 18613 as it implements ADL services. The City cannot prevent the issuance of an injunction on the ground that other telecommunications companies with franchise ordinances similar to the one challenged here might consequently challenge those ordinances and thus impose a hardship on the City.

Finally, there will be no harm to the public interest if an injunction is granted. Rather, an injunction will promote the goals articulated by Congress when it enacted the FTA and Section 253 in particular, namely competition and de-monopolization of local telephone markets.

### D. Conclusion

The City is correct when it argues that the existing Ordinance granted to AT & T does not cover the ADL services that AT & T wants to provide, regardless of changes in State and federal law subsequent to the Ordinance's adoption. AT & T must apply for and be granted a new franchise to use the City rights-of-way for the provision of ADL, but the franchise application and conditions are limited in accordance with the limited scope of the City's authority to regulate telecommunications. The new franchise ordinance will likely cover the same issues addressed in Ordinance 18613 and discussed above, such as construction and maintenance of AT & T facilities, use by other utilities of the rights-of-way occupied by AT & T, insurance, bonding and indemnity requirements, and fees for the use of rights-of-way.

Therefore, the City is hereby enjoined from enforcing any criminal provisions against AT & T for the use of the specified City rights-of-way for ADL. During the period of the injunction, AT & T must use only the existing rights-of-way, covered by Ordinance 18613. AT & T must also continue to follow the conditions in Ordinance 18613, which will protect the City's legitimate interests in managing its rights-of-way until the time a franchise ordinance can be issued specifically covering ADL.

### IV. Conclusion

Defendant's Motion to Dismiss for lack of Subject Matter Jurisdiction is DENIED. Plaintiff's Motion for Preliminary injunction is GRANTED, as detailed above.

45. The City has demonstrated its willingness to pursue criminal charges in such a situation: Dallas recently filed 196 criminal complaints against GTE Southwest based on GTE's provision of local telephone services during the period of time when GTE's old ordinance had expired and it was negotiating with the City over terms of its new ordinance. *See* Br. Supp. Pl.'s Mot. Prelim. Inj. at 21, *GTE Southwest, Inc. v. City of Dallas Texas,* No. 3–98–CV–662–R (N.D. Tex. filed Mar. 10, 1998).

46. *See, e.g., KVUE, Inc. v. Austin Broad. Corp.,* 709 F.2d 922, 929 (5th Cir.1983).

47. *See AT & T v. Austin,* 975 F.Supp. at 942.

48. *See* City of Dallas' Original Answer at 7, *Teligent, Inc. v. City of Dallas, Texas,* No. 3–97–CV–3052–R (N.D. Tex. filed Dec. 12, 1997).