AT & T COMMUNICATIONS OF THE SOUTHWEST, INC., Teligent, Inc., GTE Southwest Inc., Southwestern Bell Telephone Company, Caprock Communications Corp., Golden Harbor of Texas, Inc., and Westel, Inc., Plaintiffs,

v.

CITY OF DALLAS, TEXAS, Defendant.

No. CA 3–98–CV–003–R.

United States District Court,
N.D. Texas,
Dallas Division.

July 7, 1998.

George Harmon Tarpley, Sheinfeld Maley & Kay, Dallas, TX, Andrew William Austin, Sheinfeld Maley & Kay, Austin TX, for AT & T Communications.

Richard L. Crozier, Davidson & Troilo, Austin, TX, for Taylor Communications, Inc., USLD Communications, Inc., Caprock Communications Corp., Golden Harbor of Texas, Inc., Westel Incorporated.

Michael Anthony Shaunessy, Bickerstaff Health Smiley Pollan Kever & McDaniel, Austin, TX, Diane M. Barlow, Casey Gentz & Sifuentes, Austin, TX, for Teligent, Inc.

E. Russell Nunnally, Sally Christine Helppie, Tammy Sue Wood, Bell Nunnally & Martin, Dallas, TX, Anthony V. James, Irving, TX, Steven Gill Bradbury, John P. Frantz, Kirkland & Ellis, Washington, DC, for GTE Southwest Incorporated.

Lionel M. Schooler, Gilpin Paxson & Bersch, Houston, TX, for Sprint Communications Co.

Emily Williams, Washington, DC, for Association of Local Telecommunications Services.

Weston C. Loegering, Robert Edwin Davis, David John Schenck, Hughes & Luce, Dallas, TX, David Randall Johnson, Dallas, TX, Barbara R. Hunt, Dallas, TX, for Southwestern Bell Telephone Co.

## MEMORANDUM OPINION AND ORDER

BUCHMEYER, Chief Judge.

The plaintiffs in this case are all telecommunications companies that have challenged the adoption and enforcement by the City of Dallas of a form franchise ordinance attempting to regulate the provision of local telephone services in the City. This Court granted a preliminary injunction in this case to AT & T Communications of the Southwest ("AT & T") at a hearing held on April 9, 1998, and recently issued an opinion explaining the basis for that decision.[1] In the opinion I held that Dallas may require a telecommunications provider to obtain a franchise in order to use the City's rights-of-way for the provision of local telephone services. The franchise is limited, however, in that it may only be conditioned on a company's agreement to comply with the City's reasonable

1. *AT & T Communications of the Southwest, Inc. v. City of Dallas,* 8 F.Supp.2d 582 (N.D.Tex.1998) (hereinafter *"AT & T v. Dallas "*).

regulations of its rights-of-way and fees for use of those rights-of-way. Dallas does not have the authority under state or federal law to require a wide-ranging franchise application, to impose conditions on a franchise that are unrelated to the telecommunications provider's use of the City's rights-of-way, or to impose fees that are unrelated to use of the rights-of-way.[2]

The Court is now presented with a motion for preliminary injunction filed by plaintiff Teligent, Inc. ("Teligent"). While this motion raises many of the same issues discussed in the earlier opinion, it entails a somewhat different factual situation. Teligent plans to provide local telephone services using wireless technology involving microwave transmission and base-stations placed on private property. Teligent, therefore, differs from AT & T in that it will not own or occupy *any* City rights-of-way. Under protest, Teligent applied for and was granted a franchise ordinance. Teligent now argues that because it will not use any City rights-of-way, the City does not have the authority to require it to agree to a franchise, or to impose any conditions on its provision of local telephone services. For the reasons discussed below, the Court agrees and **GRANTS** Teligent's motion for preliminary injunction.

## I. Factual Background

In the earlier opinion issued in this case I described the history of local telephone services in Texas and the adoption of the Federal Telecommunications Act of 1996 ("the FTA"),[3] as well as the details of the form franchise ordinance adopted by the City of Dallas on November 18, 1997.[4] will not restate that discussion here, but rather I will summarize the particular factual situation of Teligent and the services it hopes to provide in Dallas.[5]

Teligent is a corporation founded in 1996, just after the passage of the FTA. Teligent intends to provide voice, data and video telecommunications services primarily to small and medium-sized businesses. In Dallas, Teligent proposes to deploy a "fixed wireless point-to-multipoint broadband local network" to provide local telephone service.[6] The network equipment will use digital microwave radio technology to transmit signals between each customer and a Teligent base station antenna site. Each base station will be located in and on top of a private building, and will have a coverage radius of approximately three miles. Unlike traditional copper and fiber based systems, Teligent's fixed wireless system will not require any physical wires between the customer's antenna and the base station antenna.

The Teligent network will also include a switch—a large computer that will analyze telecommunications data and route calls—located in a building in Dallas. Signals will be transmitted from the base station antennae to the switch either through the air via microwave or through wires in conduits leased from another local telecommunications carrier. These wires may be located in City rights-of-way, but they will not be owned by Teligent, but by another carrier that has a franchise from the City, such as Southwestern Bell.

If a call is being made from a Teligent customer to a customer of another local carrier, the switch will route the call to a switch of the other carrier, which would then complete the call over its own facilities. In such a situation Teligent would compensate the other local carrier for completion of the call pursuant to their interconnection agreement. Therefore, by using the fixed wireless system, and base stations located on private property, Teligent will not construct, own, install or

---

**2.** *See id.,* at 585.

**3.** *See id.,* at 586, discussing the FTA, Pub.L. No. 104–104, 110 Stat. 56 (codified at 47 U.S.C. § 151 *et seq.* (supp.1998)).

**4.** *See id.,* at 586.

**5.** These facts are taken from the parties' Agreed Statement of Facts, filed April 6, 1998, and from plaintiff's Motion for Preliminary Injunction, filed April 8, 1998.

**6.** Agreed Statement of Facts, ¶ 10.

maintain any facilities in the City's public rights-of-way.

On October 1, 1997, Teligent was granted a Service Provider Certificate of Operating Authority ("COA") by the Texas Public Utility Commission ("PUC"). The PUC analyzed detailed financial and technical information about the company and determined that it should be authorized to provide local exchange service in Texas, including Dallas.

The Dallas City Charter provides that the City "shall have the power ... to confer upon any person, firm or corporation the franchise or right to use the public property of the city for the purpose of furnishing to the public any general public service or benefit."[7] Relying upon this provision, the City requires all holders of State COAs to apply for and obtain a telecommunications franchise before they can provide local service in Dallas. The franchise application requires a company to submit extensive financial and technical information, as well as information about the company and its long-term plans in the City. The form franchise itself contains numerous conditions and calls for a fee equal to four percent of the company's gross receipts for all of its operations in the City.[8]

In addition to challenging the form franchise ordinance as inconsistent with the FTA and State law, Teligent also challenges the City's "9–1–1 Resolution." Under the Terms of the COA issued from the Texas PUC, Teligent is required to provide its customers with access to the 9–1–1 emergency services network, and to work diligently with local 9–1–1 entities to ensure there is no degradation of such services. As a home-rule city, Dallas has chosen to establish and administer its own 9–1–1 emergency services network. City Resolution 961121 (the "9–1–1 Resolution"), approved by the City Council on March 13, 1996, authorizes the City Man-

ager to enter into a 9–1–1 service and billing agreement with a telecommunications provider only when the provider has been issued a COA from the PUC, and a franchise from the City. Thus, without a franchise from the City, Teligent is precluded from obtaining a 9–1–1 agreement.

On October 6, 1997, while reserving its rights to challenge the City's franchise requirement, Teligent applied for a franchise to provide local telecommunications services in Dallas. The application was approved by the adoption of City Ordinance 23325 on November 12, 1997. Again subject to protest and reservations, Teligent accepted the franchise. Teligent also applied for and received a 9–1–1 service agreement. Teligent anticipated that it would be ready to provide local services in Dallas in June, 1998, and that it would commence marketing efforts approximately one month in advance of that date.

Teligent filed this suit on December 12, 1997 seeking declaratory and injunctive relief. Specifically, Teligent asks the Court to (1) enjoin the franchise requirement as it applies to Teligent; (2) enjoin the requirement that Teligent be franchised before it can obtain a 9–1–1 agreement from the City, and (3) enjoin enforcement of the franchise ordinance it did obtain from the City.

## II. Preliminary Injunction

To be entitled to a preliminary injunction, the Fifth Circuit requires that a movant carry the burden of persuasion on the following four elements: (1) a substantial likelihood of success on the merits of the movant's claims; (2) a substantial threat that movant will suffer irreparable injury if the injunction is not granted; (3) the threatened injury to the movant outweighs any harm that the other party might suffer if the injunction is entered; and (4) an injunction will not disserve the public interest.[9]

---

7. Dallas City Charter Chapter XIV, § 1.

8. *See AT & T v. Dallas*, at 587 for a more detailed description of the contents of Dallas's form franchise ordinance.

9. *Sierra Club v. City of San Antonio*, 112 F.3d 789, 793 (5th Cir.1997) (citing *Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir.1991)).

## A. Success on the Merits

Teligent argues that under the FTA and the Texas Public Utilities Regulatory Act ("PURA"), Dallas may not prohibit telecommunications providers that do not install any facilities in the public rights-of-way from competing in the City unless they obtain a franchise agreement.[10] Imposing a franchise requirement on a provider that does not use any City rights-of-way is merely an unlawful attempt to expand the City's revenues. Teligent does not challenge the City's right to impose reasonable regulations on those carriers that do actually own or install facilities in the rights-of-way, the issue raised by AT & T in its motion for preliminary injunction.

■ **1. State and Federal Law:** The Federal Telecommunications Act of 1996 was enacted "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies."[11] One method by which Congress intended to foster immediate competition was the prohibition of barriers to entry into local telephone markets. Section 253(a) of the FTA states: "No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." The only re-

maining role of local government is set out in § 253(c):

> Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

Thus, the scope of Dallas's authority to regulate telecommunications is limited to the management of and requirement of fees for use of the City's rights-of-way.

The Texas Public Utility Regulatory Act, enacted in 1976, also limits the regulatory authority of Texas cities. The PURA took away municipalities' general police powers over telephone service and gave exclusive original jurisdiction to the Public Utilities Commission.[12] The PURA, like the FTA, creates an exception under which municipalities retain the power "to grant or refuse a franchise to use the streets and alleys in the municipality or to make a statutory charge for that use," provided that the franchise does not limit or interfere with a power conferred on the State PUC.[13]

**2. The "Use" of City Rights-of-way:** Federal and Texas law therefore limit the scope of Dallas's authority to two narrow functions: requiring a franchise for or otherwise regulating use of the city's rights-of-way, and charging compensation for

---

**10.** Teligent also argues that the franchise requirement violates the Equal Protection and Due Process clauses of the United States and Texas Constitutions because the requirement is both unconstitutionally underinclusive and overinclusive. The Court need not reach this issue since it finds that the City's actions violate federal and state statutes.

**11.** Subtitle of FTA, Pub.L. No. 104–104, 110 Stat. 56, 56 (codified at 47 U.S.C. § 151 *et seq.* (supp.1998)).

**12.** *See AT & T v. Dallas,* at 593 (citing Tex. Util.Code Ann. § 52.002 (1998); *General Tel. Co. v. City of Perryton,* 552 S.W.2d 888, 891–92 (Tex.Civ.App.1977, writ ref'd n.r.e.)).

**13.** Tex.Util.Code Ann. § 14.008. *See also* § 54.205, which specifically addresses telecommunications providers: "This title does not restrict a municipality's historical right to control and receive reasonable compensation for access to the municipality's public streets, alleys, or rights-of-way or to other public property." In addition, as a home-rule city, Dallas is authorized to prohibit use of the rights-of-way without an ordinance granting consent and compensation for that use. *See* Tex.Rev.Civ.Stat.Ann. § 1175 (App.1998). *See also* discussion of these provisions in the earlier opinion in this case, *AT & T v. Dallas,* at 592.

that use. Both parties correctly recognize that the ultimate issue in this motion is whether Teligent's provision of fixed wireless service will constitute "use" of Dallas's rights-of-way under these laws.

Dallas argues that while Teligent will not "construct, own, install or maintain" any facilities in the City's rights-of-way, it will nonetheless be "using" the rights-of-way. The City states that there is no specific language in any of these statutes that limits "use" to mean "occupy" or "construct, own, install, or maintain." Rather, it argues, the term should be interpreted broadly and should include the activities of Teligent for two reasons: First, whenever a Teligent customer places a call to a non-Teligent customer, Teligent will transmit the call over the airwaves, but the completion of the call will necessarily make use of Dallas's rights-of-way. Second, Teligent admits that it may transmit calls from a base station to its switch using "capacity leased from a franchised carrier that owns facilities, some of which are likely to be located in the public rights-of-way."[14] The City does not offer any support for this proposed interpretation.

All of the legislative history surrounding the adoption of § 253(c), and the cases that have since been decided on the issue, have interpreted the provision to apply to *physical* occupation of a city's rights-of-way. For example, Senator Gorton described the provisions as allowing municipalities to control "whether there are above-ground wires or underground wires, what kind of equipment ought to be used in excavations, [and] what hours the excavations should

take place."[15] The Federal Communications Commission has also described the scope of cities' authority as the "vital tasks necessary to preserve the physical integrity of streets and highways, to control the orderly flow of vehicles and pedestrians, to manage gas water cable ... and telephone facilities that crisscross the streets and public rights-of-way."[16] In another context the F.C.C. has also held that microwave radio transmissions through the air do not constitute a "use" of any public rights-of-way.[17]

In *AT & T Communications of the Southwest, Inc. v. City of Austin,* Judge Sparks addressed the same issue. In that case AT & T stated that it would not use any of Austin's rights-of-way, but would only purchase and resell the services of Southwestern Bell Telephone, as is authorized by the FTA.[18] AT & T argued that since it would not own or maintain any facilities in the rights-of-way, Austin could not require the company to obtain municipal consent before it offered its local telephone services. Austin made the same argument that Dallas is making here: by entering agreements to use the wires of another franchised services provider—whether to resell or to transfer calls within its own system—the plaintiff is "using" the rights-of-way. Judge Sparks held, "The City's unsupported assertion that a non-facilities-based provider is 'using' the City's public rights-of-way is wholly unpersuasive. In fact, it is a metaphysical interpretation of the term 'use' that defies logic and common sense."[19] This Court is also unpersuaded that transmitting microwaves through the air, or leasing the facilities of

14. Def.'s Br. Resp. Mot. Prelim. Inj., at 12–13, quoting Agreed Statement of Facts, at 5.

15. 141 Cong.Rec. S8306 (1995) (statement of Sen. Gorton); *see also* 141 Cong.Rec. S8172 (1995) (statement of Sen. Feinstein on what types of regulation § 253(c) is designed to preserve).

16. *In re TCI Cablevision of Oakland County, Inc.,* 9 Communications Reg. (P & F), 1997 WL 580831, at ¶ 103 (F.C.C.1997); *see also In re Classic Telephone, Inc.,* 11 F.C.C.R. 13082, 1996 WL 554531, at ¶ 39 (F.C.C.1996).

17. *See In re Definition of a Cable Television System,* 5 F.C.C.R. 7638, at ¶ 28 (F.C.C.1990) ("it is well established that radio transmissions, including line of sight transmissions, such as the point-to-multipoint transmission ... do not use public rights-of-way.").

18. *See AT & T Communications of the Southwest, Inc. v. City of Austin,* 975 F.Supp. 928, 934 (W.D.Tex.1997).

19. *Id.* at 942–43; see also Judge Sparks' ultimate Findings of Fact and Conclusions of Law, *AT & T Communications of the Southwest, Inc. v. City of Austin, Texas,* 40

other providers constitutes "use" of Dallas's rights-of-way.

Texas law also supports this conclusion. Section 54.260 of the PURA describes what conditions a municipality may place on the use of public property; all of the conditions are related to the management of physical facilities in the rights-of-way. Dallas argues that the FTA and PURA maintained the City's historical right to manage the use of its rights-of-way. Historically, rights-of-way management in Texas has required a physical nexus to publically owned land.[20]

If Congress had intended the broad interpretation of § 253(c) that the City proposes it would have defined a municipality's authority as management of *all* providers of local telephone service, and the imposition of fees for the right to provide it. Through the FTA Congress expressly removed such broad regulatory power from local governments. Likewise, Texas placed general regulatory power over telecommunications providers with the PUC, and withdrew that power from municipalities.

### 3. Competitive Neutrality:
Dallas also argues that it must impose its

franchise obligations on Teligent in order to satisfy the requirement in § 253(c) that it act in a "competitively neutral and nondiscriminatory" manner. The provision simply mandates, however, that when a city imposes fees for the use of the rights-of-way, or imposes conditions on that use, it does so in a way that is competitively neutral and nondiscriminatory. The statute does not require that the City treat all providers of local telephone service identically, regardless of whether or not they use the rights-of-way, or how much of the rights-of-way they use.[21] Because Teligent will not use the City's rights-of-way at all, the City's regulatory power is not implicated, and it's duty to be competitively neutral is not invoked.[22]

### B. Irreparable Injury, Balance of Harms, and Public Interest

Teligent is a new company and a new entrant into the Dallas telecommunications market. It has no significant service history, therefore it would be very difficult to estimate damages incurred if no injunction were issued and the Company ultimately prevailed.[23] The Fifth Circuit has held that economic damages can constitute irreparable injury in such a situation.[24]

F.Supp.2d 852, 856 (W.D.Tex.1998), in which he wrote: "The essential point is that AT & T will not erect telephone polls or dig holes in the City's streets in order to install, maintain, operate, or repair SWBT's network (*i.e.*, wires, cables, and switches) because those rights and duties belong to SWBT, not to AT & T. When AT & T purchases wholesale services and network functionalities from SWBT, SWBT provides those services to AT & T through SWBT's network, and AT & T then resells those services to consumers. True, when AT & T's customers place a local telephone call, electromagnetic radiation travels through SWBT's network, but that is not to say that AT & T owns the electromagnetic radiation traveling through the network (a question which is better left to the ruminations of philosophers·than a court of law). The Court once again rejects the City's bizarre definition of the term 'use.' "

20. *See West Texas Utilities Co. v. City of Baird*, 286 S.W.2d 185, 189 (Tex.Civ.App.1956, writ ref'd n.r.e.), in which the court held that a company supplying electricity through lines

located on private property and not using the city's streets, was not "using" the city's rights-of-way and, therefore, could not be prohibited from furnishing electricity because the company did not have a franchise from the city.

21. *See AT & T v. Dallas*, at 857.

22. In fact, imposing franchise obligations on Teligent would amount to discriminating against the Company. Teligent would be forced to pay franchise fees twice: once to the City directly and once to the other service provider from which it leases facilities. The other provider with facilities in the rights-of-way would be required to have a franchise and to pay franchise fees, which it would pass on to Teligent whenever Teligent leases those facilities. *See id.* at 857.

23. *See id.* at 857, and cases cited therein.

24. *See Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 n. 1 (5th Cir.1989)

 

Teligent also argues that it will be very difficult for it to compete against the incumbent local carrier if it is forced to pay not only for the private space on which it places its equipment, but also for the right to use public space which it will not actually use.

■ As I determined in deciding on AT & T's motion for preliminary injunction, considerations of the balance of harms and the public interest support granting a preliminary injunction to Teligent.[25] The only threatened harm to the City is the loss of potential franchise fees which could easily be recouped. The City's legitimate interest in managing its rights-of-way is not threatened in any way by the actions of Teligent. Finally, the issuance of an injunction will further the goals of the FTA to promote competition and the de-monopolization of local telecommunications markets.

## III. Conclusion

By imposing franchise requirements on a telecommunications provider that will not use any of the City's rights-of-way, Dallas has overstepped the limits of its regulatory authority under the FTA and the Texas PURA. To prevent irreparable injury to Teligent, this Court **GRANTS** its motion for a preliminary injunction. The City of Dallas is hereby **ENJOINED** from (1) requiring Teligent to apply for and obtain a franchise before it can offer telecommunications services in Dallas, (2) requiring Teligent to obtain a franchise before it can enter into a 9–1–1 agreement from the City, and (3) enforcing City Ordinance 23325, by which the City granted Teligent a franchise to provide services in the City.

(quoting *Mississippi Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 630 n. 12 (1985)); *see also Lakedreams v. Taylor,* 932 F.2d 1103, 1109 (5th Cir.1991); *AT & T v.*

Teligent is **ORDERED** to post a bond in the amount of $850.

It is so **ORDERED**.

*Dallas,* at 857; *AT & T v. Austin,* 975 F.Supp. at 942.

25. *See AT & T v. Dallas,* at 857.