CABLEVISION OF BOSTON, INC., Plaintiff, Appellant,

v.

PUBLIC IMPROVEMENT COMMIS-SION OF THE CITY OF BOSTON; Joseph F. Casazza, Michael Galvin, Gary Mocia, Para M. Jayasinghe, and Stephen Shea, as Commissioners of the Public Improvement Commission of the City of Boston; City of Boston; Boston Edison Company; BecoCom, Inc.; RCN–BecoCom, LLC; RCN Telecom Services of Massachusetts, Inc.; and RCN Corporation, Defendants, Appellees.

No. 99–1222.

United States Court of Appeals, First Circuit.

Heard June 7, 1999.
Decided Aug. 25, 1999.

J. Anthony Downs, with whom Stephen D. Poss, Jeffrey A. Simes, and Goodwin, Proctor & Hoar LLP were on brief, for appellant Cablevision of Boston, Inc.

Merita A. Hopkins, Corporation Counsel, with whom Laura Steinberg and Sullivan & Worcester LLP were on brief, for appellees Public Improvement Commission of the City of Boston; Joseph F. Casazza, Michael Galvin, Gary Mocia, Para M. Jayasinghe, and Stephen Shea, as Commissioners of the Public Improvement Commission of the City of Boston; and the City of Boston.

Roscoe Trimmier, Jr., with whom R.K. Gad III, Philip C. Koski, Russell P. Hanser, Deborah L. Levi, and Ropes & Gray were on brief, for appellees Boston Edison Company and BecoCom, Inc.

Michael J. McHugh, with whom James T. Finnigan, K. Jill Rizzotti, and Rich, May, Bilodeau & Flaherty, P.C. were on brief, for appellees RCN–BecoCom, LLC; RCN Telecom Services of Massachusetts, Inc.; and RCN Corporation.

Before LYNCH, Circuit Judge, NOONAN, Circuit Judge,* and LIPEZ, Circuit Judge.

* Of the Ninth Circuit, sitting by designation.

LYNCH, Circuit Judge.

Cablevision of Boston sought a preliminary injunction in federal court against its principal local competitors in the developing broadband[1] telecommunications market. Its complaint alleged that these competitors had taken unfair advantage of their access to underground electrical conduit in violation of Mass. Gen. Laws ch. 93A. Cablevision also sought injunctive relief against the City of Boston, arguing that the City had failed to manage the conduit rights of way in a competitively neutral and nondiscriminatory manner in violation of § 253(c) of the Federal Telecommunications Act of 1996, 47 U.S.C. § 253(c).[2] After an evidentiary hearing, the district court denied the motion for a preliminary injunction. Cablevision appeals.

Cablevision's suit names as defendants Boston Edison Company, a public utility, and its unregulated affiliate BecoCom, Inc. (collectively "Boston Edison"), as well as RCN Corporation and its subsidiary RCN Telecom Services of Massachusetts (collectively "RCN").[3] It also names RCN–BecoCom ("the Joint Venture"), a joint venture between RCN and BecoCom which, like Cablevision, plans to offer broadband telecommunication services in Boston. For convenience, we refer to these entities collectively as the private defendants. In addition, Cablevision sued the Public Improvement Commission of the City of Boston ("PIC"), the PIC Commissioners, in their official capacities, and the City of Boston. We refer to these defendants collectively as "the City."

Cablevision complains that Boston Edison pulled telecommunications cable through its existing electrical conduit for the benefit of the Joint Venture without giving proper public notice of this altered use and without seeking prior approval from the City. It alleges that the City wrongfully enabled the Joint Venture to take unfair advantage of Boston Edison's existing conduit and cable, by allowing Boston Edison to convert conduit and cable for the Joint Venture's benefit over a two-year period without imposing on Boston Edison the obligations imposed on entities constructing new conduit. In contrast, Cablevision says, it has been required to go through a time-consuming public application process for new grants of location[4] when it wished to construct new conduit for broadband telecommunications cable, and it has had to provide the City with shadow conduit in that construction.

Approximately two years after passage of the Telecommunications Act, the City began imposing on conduit owners an unwritten policy that requires the owners to seek amended grants of location if they wish to expand or alter their use of existing conduit. PIC has since awarded such amended grants of location to Boston Edison, including after-the-fact amendments for conduit conversions that occurred between 1996 and 1998. Cablevision's preliminary injunction would prevent the City

---

1. "Broadband" or "bundled" telecommunications services include telephone service, high-speed data transmission, Internet access, and video service.

2. Cablevision relies on the following emphasized portions of § 253(c):

    Nothing in this section affects the authority of a State or local government *to manage the public rights-of-way* or to require fair and reasonable compensation from telecommunications providers, *on a competitively neutral and nondiscriminatory basis*, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

    47 U.S.C. § 253(c) (emphasis added).

3. RCN argues that no claims are made against it in this case and that it appears to have been named as a defendant in order to maximize the breadth of injunctive relief. Given our disposition of the appeal, we do not delve further into this argument.

4. Grants of location, for present purposes, are the permission given by the City to cut through its streets to install conduits or to perform other work underground.

from granting the private defendants any further amended grants of location and would forbid the private defendants from installing any new telecommunications cable in electrical conduit or expanding their commercial usage of any previously installed telecommunications cable.

We set aside, for the narrow purposes of this appeal, the difficult question whether Cablevision has a cause of action to enforce rights under § 253(c), as well as related questions regarding the proper interpretation of that section of the Telecommunications Act. Assuming *arguendo* that Cablevision has a § 253(c) cause of action and that § 253(c) requires the City to manage its rights of way on a competitively neutral and nondiscriminatory basis, we determine that Cablevision is unlikely, in any event, to show that the City failed to fulfill this requirement. We further conclude that Cablevision is unlikely to prevail on its Chapter 93A claim in this action. Thus, we affirm the district court's denial of preliminary injunctive relief.

## I. FACTS

The facts are largely taken from the opinion of the district court. For the most part, these are undisputed; the few points of disagreement are noted. Because key aspects of this case involve changes that have occurred over time and actions that are alleged to have been untimely, we present the facts chronologically.

In Boston, as elsewhere, the electricity and cable television businesses were once entirely distinct enterprises. Boston Edison has provided electricity to customers in the Greater Boston area since 1886, using a large network of underground conduits as well as above-ground transmission lines and towers. As a public utility, Boston Edison has enjoyed a statutory monopoly. Cablevision is equally well-established in Boston as a provider of cable television. It began building a system to deliver cable television signals within Greater Boston in the 1970s and largely completed that system, and began providing cable service, by 1982. Unlike Boston Edison, Cablevision does not possess a statutory monopoly. However, it did enjoy a de facto monopoly for many years. Although its two franchise agreements with the City have been non-exclusive, it had no local competitors until 1996, when a predecessor affiliate of RCN entered the Boston cable television market. Cablevision still services approximately ninety-seven percent of Boston cable customers.

In order to reach their customers, both Boston Edison and Cablevision have needed to install conduit under the streets of Boston. State law permits them to do so, *see* Mass. Gen. Laws ch. 166, § 21, but requires them to first obtain a grant of location from the appropriate municipal authority, *see id.* § 22. Cablevision obtains grants of location for its conduit from the PIC, which is the division of the City's Department of Public Works responsible for construction projects involving City streets. Applicants submit a detailed public petition to the PIC, which decides after a public hearing whether to bestow the requested grant of location. Boston Edison receives similar grants of location for its electrical conduit from another municipal authority, the Inspectional Services Division (ISD). It is not clear from the record whether the ISD process is as open to public involvement as the PIC procedure. It appears, in any case, that the PIC is the entity ultimately responsible for maintaining a record of the various grants of location—a record that amounts to a map of Boston's subterranean conduit network.

Since 1988, the PIC has enforced a written "Policy Relating to Grants of Location for New Conduit Network for the Provision of Commercial Telecommunications Services" ("the PIC Policy"), which was designed to minimize the number of times City streets would have to be torn up for underground construction, while simultaneously maximizing the amount of conduit space available for the provision of telecommunication services. As its full name

makes clear, the PIC Policy applies only to the installation of new conduit for commercial telecommunications purposes. The PIC Policy requires any entity or "Lead Company" that wishes to install new telecommunications conduit to build additional empty shadow conduit for the City that can be used to meet future demand. Once the City's shadow conduit is installed, the PIC Policy requires a provider to lease any available space in that conduit before constructing new conduit. The PIC Policy, as amended, also requires those constructing new conduit to notify all interested telecommunications providers of their intent to cut the street and to offer these providers the opportunity to have their own conduit installed at the same time. Under the policy, participants in approved projects share the costs of excavation, conduit construction (including construction of shadow conduit), and street resurfacing.

The parties debate the extent to which Cablevision has been economically burdened by the PIC Policy. Boston Edison notes that most of Cablevision's conduit was constructed prior to the adoption of the PIC Policy in 1988, while Cablevision emphasizes the delays and expenses that it has borne for any conduit installed since that time. By contrast, Boston Edison has been able to avoid these burdens to the extent that it installed conduit for electric utility purposes only. Before October 1998, when the Joint Venture first petitioned PIC as a Lead Company, neither Boston Edison nor any of its affiliates had ever applied to the PIC for a grant of location.

But long before October 1998, Boston Edison had been considering expanding into the telecommunications business and taking steps in that direction. One driving force behind this transformation was the need to diversify in response to the deregulation of the electricity business. Another factor was opportunity. Boston Edison already owned a vast distribution network, in the form of conduit and poles, which could be used to carry telecommunications cable. Moreover, it already had a rudimentary fiber optic network in place that was originally built to carry signals to control the distribution of electricity, but which had significant excess capacity. According to Boston Edison, the excess capacity was not a planned feature; rather, it came about because manufacturers of fiber optic cables included many more fiber strands in their standard product than Boston Edison needed for utility purposes.

In late 1995, Boston Edison informed the PIC Chairman, Joseph Casazza, that it intended to use its existing conduit (and excess fiber capacity) for commercial telecommunications purposes and asked Casazza whether the City had any policies regarding this conversion. After taking a month to consider the issue, Casazza told Boston Edison that he did not think the City had an applicable policy. In particular, he did not think that the PIC Policy applied, since, by its terms, it referred only to the construction of new conduit. In response to Boston Edison's query, Casazza decided to convene a small working group, composed of Boston Edison and certain local telecommunications providers, to draft a proposed policy on the conversion of existing conduit and cables.

Meanwhile, Boston Edison began to expand its fiber optic network in 1996 with the goal of eventually entering the telecommunications business. Although the expansion was significant (involving more than 7,000 "fiber-miles" along 103 right-of-way miles), it apparently did not involve the installation of any new conduit under Boston streets, and so did not expose Boston Edison to the demands of the extant PIC Policy.

Once Boston Edison made the decision to construct a fiber optic network for telecommunications purposes, it also began to search for customers (i.e., telecommunications providers) that might want to make use of the network. According to Boston Edison, it contacted Cablevision along with a number of other providers, but Cablevision stated that it had no interest in using

Boston Edison's network. Cablevision vigorously disputes this point; it claims that a Boston Edison official made only an informal, offhand comment about access to fiber and never made clear that Boston Edison was offering access to its underground electrical conduit within the City of Boston.

Boston Edison eventually entered into a joint venture agreement with RCN, which had begun supplying cable television to a small number of Boston customers. The Joint Venture, Cablevision's competitor in the developing broadband market, is the product of that agreement.[5] RCN issued a press release on June 30, 1996 to announce the formation of the Joint Venture with Boston Edison. The press release stated that the Joint Venture would benefit from the use of Boston Edison's "large fiber optic network." The Boston Globe later repeated this point, reporting that "RCN hopes to use Boston Edison's 200 mile fiber optic network and its rights of way into customers['] homes to compete head to head with the large telecommunications providers." In June 1997, Beco-Com and the Joint Venture entered into an agreement giving the Joint Venture the right to use the conduit and cable network that Boston Edison assigned to BecoCom pursuant to a license agreement. The Joint Venture has begun using this network to deliver telecommunications service in Boston.

While these changes were occurring in Boston, a dramatic change was made in federal telecommunications law. On February 8, 1996, Congress enacted the Telecommunications Act of 1996(TCA), Pub.L. No. 104–104, 110 Stat. 86 (codified at 47 U.S.C. § 151 et seq.), to remove regulatory barriers and encourage competition among telecommunications providers. Although a large portion of the TCA focuses on the deregulation of the telephone industry, Congress also expressly anticipated and welcomed the entry of electrical utilities into the telecommunications business.

Several months after passage of the TCA, the industry working group presented Casazza with a draft policy regarding the use of utility conduit and cable for commercial telecommunications. The proposed policy would have required utilities to submit plans to the PIC showing the location of all existing cable and conduit that were selected for conversion. In addition, the policy would have required utilities to apply to the PIC for an amended grant of location before adding telecommunications cable to utility conduit or converting existing utility cable to telecommunications use.

Casazza did not immediately act on the working group's recommendations. He had several reasons to delay his decision. First, he wanted to be sure that any PIC policy regarding conversion was compatible with requirements imposed by the TCA. Casazza states that he wanted to avoid hurriedly adopting a policy that might "be in conflict with a brand new law that we totally didn't understand." He also wanted to be sure that the PIC stayed within the narrow scope of its authority. In Casazza's view, the PIC's purpose is not to control the usage of conduit and cable,

5. Once the Joint Venture was formed, it applied to the Federal Communications Commission ("FCC") for authorization to provide video services as an operator of an Open Video System ("OVS") under 47 U.S.C. § 573 (codifying § 653 of the Telecommunications Act). OVS providers are subject to different legal and regulatory obligations than those providing traditional Multiple Video Programming Distribution ("MVPD") cable service. See id. § 573(c). On February 27, 1997, the FCC granted the Joint Venture certification to operate an OVS, and on June 2, 1997, the Joint Venture and the City entered into an Interim Open Video Service Agreement.

The Joint Venture was, at the time of the preliminary injunction motion, also negotiating a long term cable franchise agreement with the City, which would give Boston residents a choice of MVPD cable providers. According to the Joint Venture, it has committed to make the same licensing payment to the City that Cablevision makes, equal to five percent of gross annual revenues from cable television service.

but rather to manage city streets and keep appropriate records. In informal terms, Casazza explains, that purpose is fulfilled by telling businesses "[if] you're under our streets, come in here and tell us who you are, [and] where you are, so we can make a map." Casazza notes that the City needs to have such a map so that, for example, "the next time [a] contractor digs up a city street we're not going to wipe out all the research at Tufts Medical Center."

In light of this understanding of the PIC's mandate, Casazza emphasizes that he never gave Boston Edison permission to convert cables or conduit for telecommunications purposes; nor did he deny Boston Edison permission to do so. Rather, Casazza simply advised Boston Edison and the other members of the working group that he did not intend to immediately adopt the group's proposed policy, and that they would therefore have to continue with conversions at their own risk, subject to any future policy adopted by the PIC, the City, or some other regulatory authority. It is unclear from the record whether Cablevision was present at this meeting.

To date, the City has still not adopted any formal written policy regarding grants of location for converted conduit or cable. However, the PIC has begun enforcing an oral policy, loosely tracking the industry-drafted policy from April 1996, which requires businesses to acquire amended grants of location if they change their usage of existing conduit or cable. It is not clear from the record whether this oral policy requires businesses to seek an amended grant of location before they install any new cable or merely before they put the new (or existing) cable to an altered use.

The City informed Boston Edison of this policy by telephone conversation on April 6, 1998. After seeking further clarification, Boston Edison presented its first petition for amended grants of location on June 5, 1998. In the fall of 1998, Boston Edison filed additional petitions with the PIC for amended grants of location, a number of which pertained to conversions that Boston Edison had already completed. Over Cablevision's objections, the PIC granted each of these petitions. During the same time period, the PIC also applied its conversion policy to Bell Atlantic, a telephone utility that had previously installed additional telecommunications cable in its conduit. Acting on five to ten Bell Atlantic petitions, the PIC recorded amended grants of location to reflect Bell Atlantic's expanded use of its conduit for telecommunications purposes. The PIC granted the petitions from Boston Edison and Bell Atlantic without considering the impact of the amended grants of location on competition in the telecommunications business.

## II. PROCEDURAL HISTORY

Cablevision filed a federal lawsuit against the City and the private defendants on December 14, 1998. The complaint alleges that the private defendants carried out a "scheme ..: designed to create a 'stealth' telecommunications network using ratepayer funds and ... to obtain through deception an unfair competitive advantage ... by violating City ordinances and policies governing the use of conduits and cables buried under Boston's streets." According to Cablevision, the private defendants violated Chapter 93A (Massachusetts' unfair trade practices law) when they concealed their use of electrical conduit for telecommunications purposes from the City, avoided applying for permission to convert electrical conduit, and failed otherwise to notify competitors of the planned conversions, in order to lower their costs and beat competitors in the race to sign up telecommunications customers.[6]

6. Although Cablevision's complaint also included a civil conspiracy count against the private defendants, Cablevision does not pursue any separate conspiracy arguments on this appeal. Thus, we do not consider the conspiracy count further.

In the alternative, Cablevision suggests that the City knew about the private defendants' wrongful actions all along and secretly permitted those actions. Regardless of the City's knowledge of the private defendants' activities, Cablevision complains, the City's recent decision to give Boston Edison after-the-fact or retroactive amended grants of location "enables the defendants' scheme to succeed" and "solidif[ies] the significant unfair competitive advantage the non-municipal defendants have obtained," in violation of the City's obligation under § 253(c) to manage its rights of way in a competitively neutral and nondiscriminatory manner.[7]

Cablevision seeks both damages and injunctive relief. Its proposed preliminary injunction would require the City to deny the private defendants any further grants of location, whether amended or new, for conduit or cable that is specifically intended for commercial telecommunications use or that uses or connects to any conduit or cable for which Boston Edison has already received amended grants of location. In addition, the injunction would require the City to determine how each segment of the private defendants' conduit and cable is being used and to report these uses to the parties and the court. The injunction would place similar demands on the private defendants, requiring them to cease any expansion of their telecommunications infrastructure or business and to furnish a complete description of all portions of their network that rely on former electrical conduit or cable.

The parties admirably agreed to maintain the status quo for a period of time to enable the district court to hold a hearing and reach a decision on Cablevision's preliminary injunction motion. In addition to considering voluminous filings, including affidavits, the court held a six-hour evidentiary hearing on January 20, 1999, before denying the motion. *See Cablevision of Boston, Inc. v. Public Improvement Comm'n*, 38 F.Supp.2d 46, 49 (D.Mass. 1999).

Applying the familiar preliminary injunction standard, the district court considered four factors: (1) the likelihood of plaintiff's success on the merits, (2) the threat of irreparable harm to the plaintiff in the absence of an injunction, (3) the balance of equities, and (4) the public interest. *See I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 33 (1st Cir.1998) (explaining standard). While recognizing that the first of these factors is the most critical, *see Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir.1996); *Gately v. Massachusetts*, 2 F.3d 1221, 1225 (1st Cir.1993), the district court denied Cablevision's motion because it found that Cablevision failed to make the necessary showing on each of the four factors. *See Cablevision*, 38 F.Supp.2d at 53–63.

The court first considered whether Cablevision has a legal basis to assert a claim

It should also be emphasized that—despite the reference in the complaint to Boston Edison's use of "ratepayer funds"—neither Cablevision's federal law claim nor its state law claim includes an allegation that Boston Edison wrongfully used ratepayer assets to subsidize its commercial telecommunications ventures. At the time of the preliminary injunction hearing, a proceeding was pending before the Massachusetts Department of Telecommunications and Energy concerning, inter alia, the effect of transfers of the Boston Edison fiber optic network to BecoCom on the Boston Edison rate base. Cablevision sought to intervene in that proceeding, apparently contending that Boston Edison acted deceptively as to the value of the assets being transferred. Neither the district court opinion nor this opinion draws any conclusions about that matter.

7. Cablevision's brief also contains a skeletal argument that the City's compensation scheme fails to be competitively neutral and nondiscriminatory because Boston Edison does not pay a franchise fee. We do not address this argument since the record shows that the Joint Venture and the City have been negotiating a franchise agreement under which the Joint Venture has committed to make the same franchise payment to the City as Cablevision makes.

under § 253(c). Cablevision proposed three possible bases: an implied right of action under § 253(c) itself, an enforcement action under § 1983, and a preemption claim under the Supremacy Clause. The district court was skeptical about the first two bases, but concluded that Cablevision could probably seek limited relief directly under the Supremacy Clause. *See id.* at 54–58.

The court went on, however, to find that Cablevision was unlikely to succeed on the merits of its § 253(c) claim. Its analysis was multilayered. First, the court questioned whether the phrase "competitively neutral and nondiscriminatory" applies to local authorities' management of their rights of way. *See id.* at 58. The court then distinguished between the two terms, finding it unlikely that § 253(c) requires management of public rights of ways to be "competitively neutral," but possible that § 253(c) requires such management be "nondiscriminatory." *See id.* at 58–59. Assuming *arguendo* that a nondiscrimination requirement does apply, the court concluded that Cablevision is nonetheless unlikely to prevail on its § 253(c) claim because the City has managed its rights of way in a nondiscriminatory manner by treating similarly situated entities alike. *See id.* at 59–60.

The court also concluded that Cablevision is unlikely to prevail on its Chapter 93A claim. It found that the private defendants did not appear to have acted unscrupulously or to have violated any state law or regulation; indeed, the court found, the PIC may have affirmatively permitted the private defendants' actions, thus providing them with a safe harbor under § 3 of Chapter 93A. *See id.* at 60–62. Thus, the court concluded that Cablevision was not likely to prevail on the merits of either its federal or its state claim.

As to the preliminary injunction requirement of irreparable injury, the court found that loss of market share was an irreparable injury to Cablevision, but that Cablevision had brought this injury on itself by coming so late to the Boston broadband telecommunications market. *See id.* at 62–63. The court found further that Boston Edison and the other private defendants would suffer irreparable injury if an injunction issued, and finally, that issuing an injunction would be contrary to the public interest in robust competition among telecommunications providers. *See id.* at 63.

## III. STANDARD OF REVIEW

■ The standard of review for the grant or denial of a preliminary injunction has several components. "The usual rubric refers to abuse of discretion," *Ocean Spray Cranberries, Inc. v. Pepsico, Inc.,* 160 F.3d 58, 61 n. 1 (1st Cir.1998), which entails giving "considerable deference" to the district court's decision, *Ross–Simons,* 102 F.3d at 16. The abuse of discretion standard applies, in particular, to "issues of judgment and the balancing of conflicting factors." *Ocean Spray Cranberries,* 160 F.3d at 61 n. 1. But "rulings on abstract legal issues remain reviewable de novo, and findings of fact are assessed for clear error."[8] *Id.; see also I.P. Lund,* 163 F.3d at 33.

## IV. FEDERAL TELECOMMUNICATIONS ACT CLAIM

The central question on appeal is whether the district court erred when it concluded that Cablevision is unlikely to succeed on the merits of its § 253(c) claim. This question involves a number of subsidiary questions, most of which we merely identi-

---

**8.** Cablevision argues that our review of factual findings should be plenary to the extent that those factual findings were based on a false understanding of the applicable law. *See I.P. Lund,* 163 F.3d at 33 (observing that "[i]f findings are made under incorrect stan-

dards, little or no deference is due those findings"). The argument is not relevant here, since the pivotal issues do not involve factual findings made by the district court under an erroneous legal standard.

fy and set aside in order to focus on the crux of this matter: whether, pursuant to § 253(c), the PIC has been obligated since 1996 to regulate Boston Edison's use of cable and conduit in order to create a level playing field among competitors in the Boston telecommunications market. We determine that § 253(c) did not place such an obligation on the PIC. Thus, we affirm, albeit on different grounds, the district court's conclusion that Cablevision is unlikely to prevail on its § 253(c) claim.

## A. *Section 253(c) in Context*

Cablevision's § 253(c) argument can only be evaluated by placing that subsection in the larger context of the TCA. Although the TCA is technically written as a set of amendments to the Communications Act of 1934, 47 U.S.C. § 151 et seq., it actually represents a dramatic shift in the nature of telecommunications regulation. Regulation of the telephone industry (once the principal form of telecommunications) was long premised on the belief that only monopolies could provide reliable, universal service. Thus, state and federal regulators spent decades protecting monopolies from competition. The TCA takes the opposite approach: rather than shielding incumbent telephone companies from competition, it requires them to provide other participants in the telecommunications market with competitive access to their networks and services. This shift exemplifies a widespread change in the laws governing regulated industries. *See* Kearney & Merrill, *The Great Transformation of Regulated Industries Law,* 98 Colum. L.Rev. 1323, 1325–26 (1998) ("Instead of striving for equality of treatment among end-users and reliability of service, the new paradigm seeks to encourage multiple providers to offer different packages of services at different prices to end-users, on the theory that competition among these providers will enhance consumer welfare.")

Three central provisions of the TCA— § 251, § 252, and § 253—instantiate this policy. Section 251 defines the duties of different classes of telecommunications providers. *See* 47 U.S.C. § 251. All telecommunications carriers have a duty "to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers." *Id.* § 251(a). "[L]ocal exchange carriers" (i.e., those who provide telephone service, *see id.* § 153(26)) also have a duty to allow resale of their services, to provide number portability and dialing parity, to establish reciprocal compensation agreements, and "to afford access to th[eir] poles, ducts, conduits, and rights-of-way ... to competing providers." *Id.* § 251(b). An "incumbent local exchange carrier" (i.e., a telephone service provider in existence when the Act was passed, *see id.* § 251(h)) is further obligated to provide interconnection with its network and "unbundled" access to individual network elements on "just, reasonable, and nondiscriminatory" terms and to offer its services for resale at wholesale rates. *Id.* § 251(c).

Section 252 provides the means of enforcement for the requirements that § 251 places on incumbent local exchange carriers. *See* 47 U.S.C. § 252. It sets out procedures for negotiation, arbitration, and approval of interconnection or service agreements between incumbent local exchange carriers and other carriers. *See id.; see also Puerto Rico Tel. Co. v. Telecommunications Regulatory Bd.,* Slip Op. at 13–32 (1st Cir. Aug. __, 1999) (discussing § 252).

Section 253 is aimed at those who might impede the open competition engendered by §§ 251 and 252. Section 253(a) ensures that state and local regulations do not serve as barriers to entry into the telecommunications market:

> No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

47 U.S.C. § 253(a). Congress apparently feared that some states and municipalities might prefer to maintain the monopoly status of certain providers, on the belief that a single regulated provider would provide better or more universal service. Section 253(a) takes that choice away from them, thus preventing state and local governments from standing in the way of Congress's new free market vision. *Cf. Town of Amherst v. Omnipoint Communications Enters., Inc.*, 173 F.3d 9, 12–16 (1st Cir.1999) (discussing 47 U.S.C. § 332(c)(7)(B)(i), a similar provision in the TCA which provides that "the regulation of ... personal wireless service facilities ... shall not prohibit or have the effect of prohibiting the provision of personal wireless service").

However, Congress also recognized the continuing need for state and local governments to regulate telecommunications providers on grounds such as consumer protection and public safety, which are separate from any intent to create or maintain barriers to entry. Thus, it carved out safe harbors for these types of regulations:

(b) *State regulatory authority*

Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this section, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

(c) *State and local government authority*

Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory ba-

sis, if the compensation required is publicly disclosed by such government.

47 U.S.C. § 253(b), (c).

These subsections take the form of savings clauses, preserving certain state or local laws that might otherwise be preempted under § 253(a). At the same time, the division between (b) and (c) seems to define the boundaries of each body's regulatory authority: it suggests that states may regulate broadly with respect to public safety and welfare, service quality, and consumer protection, while local governments, in addition to any powers specifically delegated by the state, have narrower residual authority to manage and demand compensation for the use of their rights of way. *See AT & T Communications of the Southwest, Inc. v. City of Dallas*, 8 F.Supp.2d 582, 591 (N.D.Tex. 1998) (noting that while "the more general authority" of § 253(b) is reserved for the states, they have the power to delegate such authority to local governments); *In re TCI Cablevision*, 12 F.C.C.R. 21,396, ¶ 102–104, 109 (Sept. 19, 1997) (stating that (b) and (c) define the subject area of permissible regulation at the state and local level).

Other aspects of § 253(b) and (c) are less clear. One open question is whether state or local regulations that are not competitively neutral or nondiscriminatory necessarily constitute violations of § 253(a). If so, then § 253(b) and (c) are only savings clauses, which happen to restate, in different terms, the general rule of § 253(a). If, on the other hand, a regulation could fail to be competitively neutral or nondiscriminatory without constituting a de facto prohibition on entry, then (b) and (c) could be read to impose requirements of "competitive neutrality" and "nondiscrimination" that are separate from § 253(a)'s restriction against "prohibitions on entry."

If the latter interpretation were correct, then an additional question would arise: how could the putative "competitive neutrality" and "nondiscrimination" require-

ments be enforced? The next subsection of § 253 could be read to provide a partial answer to this question:

(d) *Preemption*

If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

*Id.* § 253(d). The creation of an enforcement mechanism for § 253(b) suggests that this provision, while styled as a savings clause, also imposes a requirement on state regulation that is separate from that imposed by § 253(a). On this reading, the FCC would be able to enforce the requirement under § 253(d).

But § 253(d) raises more questions than it answers. It is not clear, for instance, whether Congress intended FCC preemption to be the sole means of enforcing § 253(a) and (b), or, if a private cause of action does exist to enforce either of these subsections, whether the FCC is intended to have primary jurisdiction. *Compare, e.g., GST Tucson Lightwave, Inc. v. City of Tucson,* 950 F.Supp. 968, 970 (D.Ariz.1996) (assuming that § 253(d) was meant to be an exclusive remedy for violations of § 253), *with City of Abilene v. FCC,* 164 F.3d 49, 51–52 (D.C.Cir.1999) (deciding a § 253(a) preemption claim on the merits), *Bell Atlantic–Maryland, Inc. v. Prince George's County,* 49 F.Supp.2d 805, 813 (D.Md.1999) (assuming that a cause of action exists to bring a § 253(a) claim), *and AT & T Communications,* 8 F.Supp.2d at 589 (rejecting the argument that the FCC has primary jurisdiction over § 253(a) claims).

In addition to these uncertainties, Section 253(d) raises questions about the proper analysis of § 253(c). If § 253(b) imposes a restriction separate from the

one in § 253(a), it would seem most natural for § 253(c) to impose such a restriction as well, since the language of (c) is nearly identical to the language of (b). Yet Congress chose to include (b), and not (c), under the FCC preemption provision of § 253(d). There are at least two ways to understand this choice.

One explanation is that Congress intended § 253(c) (if not § 253(b)) to be a savings clause only. Under this interpretation, § 253(c) could only be used defensively, in the context of a § 253(a) challenge; the statute would simply not apply to local regulations that are not competitively neutral and nondiscriminatory but nonetheless do not constitute prohibitions on entry. *See GST Tucson Lightwave,* 950 F.Supp. at 971 (adopting this interpretation of § 253).

Alternatively, the exclusion of § 253(c) from § 253(d) might reflect Congress's selection of a forum for § 253(c) claims, limiting jurisdiction to federal or state courts instead of forcing municipalities with limited resources to defend rights-of-way regulations and fee structures before the FCC in Washington, D.C. Cablevision argues for this reading, which has been adopted by a number of courts on statutory interpretation and legislative history grounds. *See, e.g., TCG Detroit v. City of Dearborn,* 977 F.Supp. 836, 840 (E.D.Mich.1997) (finding that "the implication [of § 253(d)'s exclusion of § 253(c)] is that any violation of 253(c) could not be preempted [by the FCC] but rather would have to be[ ] challenged locally" and that legislative history supports this interpretation). If this interpretation were correct, it would become necessary to decide whether the proper cause of action for a § 253(c) claim is created by § 253(c) itself or arises from some other source.

We prefer to reserve judgment on these questions, since they are not, in the end, dispositive of this appeal and so may be viewed as theoretical. Because the TCA is extremely complex and its provisions high-

ly interrelated, it is wiser to interpret it only as needed in light of specific facts. Like the district court, we will assume *arguendo* that § 253(c) does impose a "competitively neutral and nondiscriminatory" requirement and that a cause of action exists to enforce that requirement.[9] We turn now to a subset of statutory interpretation questions regarding the scope of this assumed requirement.

    B.  *Scope of the "Competitively Neutral and Nondiscriminatory" Requirement*

According to Cablevision, the City's obligation to manage its grant-of-location process in a competitively neutral and nondiscriminatory manner can be read directly from the language of § 253(c). The district court disagreed, finding that "[t]he syntax of [§ 253(c)] renders its meaning ambiguous," and in particular, that "[i]t is not clear whether the phrase 'competitively neutral and nondiscriminatory' applies only to the compensation that can be required, ... or whether it also applies to the management of public ways...." *Cablevision*, 38 F.Supp.2d at 58.

As a matter of bare syntax, we find the language to be unambiguous: the phrase "on a competitively neutral and nondiscriminatory basis" can only apply to compensation schemes, not management decisions. To see why this is so, it is necessary to look closely at that phrase in context:

> Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, *on a competitively neutral and nondiscriminatory basis*, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

47 U.S.C. § 253(c) (emphasis added). The scope of the emphasized language would be ambiguous if the text following the emphasized phrase were omitted. In that case, the sentence would present what linguists label a "prepositional phrase attachment" problem, i.e., an ambiguity arising from the fact that a prepositional phrase within a sentence might "attach" to the sentence's syntactic structure at more than one level.[10] *See* Akmajian et al., *Linguis-*

---

**9.** The plurality decision in *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), does not preclude us from making this assumption. Whatever the scope of *Steel Co.*'s recommended order of analysis, *see Ruhrgas AG v. Marathon Oil Co.*, —— U.S. ——, ————–——, 119 S.Ct. 1563, 1569–70, 143 L.Ed.2d 760 (1999); *Parella v. Retirement Bd. of the R.I. Employees' Retirement System*, 173 F.3d 46, 53 (1st Cir.1999), it does not require courts to decide whether a cause of action exists prior to considering arguments based on the merits, because "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, i.e., the courts' statutory or constitutional power to adjudicate the case." *Steel Co.*, 523 U.S. at 89, 118 S.Ct. 1003; *see also Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946) ("Jurisdiction ... is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover.").

    *Steel Co.* does command that initial consideration be given to the existence of Article III

standing, where such standing is in doubt. This question is different from the question of statutory standing, although the two may be interrelated. Article III standing depends on whether Cablevision has met the three irreducible *minimum* requirements: *injury in fact, causation, and redressability. See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). While there may be some question whether causation is established as to all of the defendants, *see supra* note 3, and some question about redressability, Cablevision's allegations are sufficient to plead Article III standing and are not frivolous or wholly unsubstantial.

**10.** The attachment ambiguity can be represented using nesting brackets to show the relevant syntactic structure. A higher level attachment of the relevant phrase would produce the following structure: "the authority of a State or local government [[to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers] [on a competitively neutral and nondiscriminatory basis]]." A lower lev-

*tics: An Introduction to Language and Communication* 169–70 (1995) (giving a representation for such structural ambiguities). But no such attachment problem is presented here.

In context, the emphasized language can only modify the immediately preceding phrase, "to require fair and reasonable compensation from telecommunications providers." There is a technical linguistic basis for this reading: because—for semantic rather than syntactic reasons—the following phrase "for use of public rights-of-way on a nondiscriminatory basis" can only attach to the phrase "to require fair and reasonable compensation from telecommunications providers," it "traps" the phrase "on a competitively neutral and nondiscriminatory basis" at this same level.[11] And contrary to Cablevision's argument, the commas surrounding the phrase "on a competitively neutral and nondiscriminatory basis" do not automatically alter the phrase's syntactic scope; the commas merely enhance the readability of § 253(c) without changing its syntax. Even apart from technical linguistic rules, there is a strong argument that the plain meaning of the statute, despite the contrary interpretation by the FCC and other courts, is that "on a competitively neutral and nondiscriminatory basis" does not refer to management of rights of way at all.

■■■ But the task of statutory interpretation involves more than the application of syntactic and semantic rules to isolated sentences. Even plain meaning can give way to another interpretation if

necessary to effectuate Congressional intent. *See Greenwood Trust Co. v. Massachusetts,* 971 F.2d 818, 825 (1st Cir.1992) ("Terms in an act whose meaning may appear plain outside the scheme of the statute can take on a different meaning when read in their proper context. . . . In short, the plain-meaning doctrine is not a pedagogical absolute."); *SEC v. Lehman Bros., Inc.,* 157 F.3d 2, 8 (1st Cir.1998) ("literal language does not always prevail"). Rather than "culling selected words [or sentences] from a statute's text and inspecting them in an antiseptic laboratory setting, a court engaged in the task of statutory interpretation must examine the statute as a whole, giving due weight to design, structure, and purpose as well as to aggregate language." *O'Connell v. Shalala,* 79 F.3d 170, 176 (1st Cir.1996); *see also King v. St. Vincent's Hospital,* 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991) ("[T]he cardinal rule [is] that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context." (citation omitted)).

At times, an examination of the context of disputed language can lead courts to decide that a linguistically implausible interpretation best reflects the legislature's intent. Section 253(c) may require this sort of generous reading. *See California Fed. Sav. & Loan Ass'n v. Guerra,* 479 U.S. 272, 284, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987); *Bob Jones Univ. v. United States,* 461 U.S. 574, 586, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983) ("It is a well-established canon of statutory construction that

el attachment would produce the following structure: "the authority of a State or local government [to manage the public rights-of-way] or [[to require fair and reasonable compensation from telecommunications providers] [on a competitively neutral and nondiscriminatory basis]]."

**11.** A simple example may make this point more evident. In the sentence "Mary suggested that the man get a kitten or a puppy from a pet store," the phrase "from a pet store" could refer to the puppy alone, or the puppy and the kitten. (The two different syntactic trees can be represented by bracketing the phrases: "Mary suggested that the man get [a kitten] or [[a puppy] [from a pet store]]" versus "Mary suggested that the man get [[a kitten or a puppy] [from a pet store]].") But in the sentence "Mary suggested that the man get a kitten or a puppy from a pet store to enter in dog shows," the phrase "from a pet store" refers only to the puppy, since it is "trapped" within the noun phrase "a puppy to enter in dog shows." (Here the sentence must be bracketed as follows: "Mary suggested that the man get [a kitten] or [[a puppy] [from a pet store] [to enter in dog shows]].")

a court should go beyond the literal language of a statute if reliance on that language would defeat the plain purpose of the statute....."); *Watt v. Alaska,* 451 U.S. 259, 266, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981) ("The circumstances of the enactment of particular legislation may persuade a court that Congress did not intend words of common meaning to have their literal effect."); *United Steelworkers v. Weber,* 443 U.S. 193, 201, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) (rejecting literal reading of statute in light of Congressional purposes in enacting statute). To the extent that Congress intended to impose any requirement that local regulations be "competitively neutral and nondiscriminatory," the larger context suggests that it would have wanted to impose that requirement on both management of rights of way and compensation schemes, since discriminatory or competitively slanted management of the public rights of way could interfere with open competition among telecommunications providers just as easily as discriminatory or competitively slanted compensation schemes.

At present, the weight of authority seems to favor this contextual interpretation of § 253(c) over a literal, syntactically accurate one. The FCC did appear to limit the "competitively neutral and nondiscriminatory" language to compensation schemes in its *Suggested Guidelines for Petitions for Ruling Under Section 253,* 63 Fed.Reg. 66,806 (1998). *See id.* at 66,-808 (including the following in the list of questions for filers to answer: "Does the challenged statute, regulation, ordinance, or legal requirement pertain to the man-agement of, or compensation for access to, rights-of-way? ... If compensation is involved, is it fair and reasonable and required on a competitively neutral and nondiscriminatory basis?"). But in its decisions, the FCC has clearly adopted— without any discussion—the broader reading of § 253(c). *See In re Classic Telephone, Inc.,* 11 F.C.C.R. 13,082, ¶ 39 (Oct. 1, 1996); *TCI Cablevision,* 12 F.C.C.R. at ¶ 108. Courts and commentators have also adopted the broader reading without considering the possibility that the phrase "competitively neutral and nondiscriminatory" does not refer to the management of rights of way. *See, e.g., TCG Detroit,* 977 F.Supp. at 840–41 (assuming the broader reading without discussion); Worstell, Note, *Section 253 of the Telecommunications Act of 1996: A Permanent Physical Appropriation of Private Property that Must Be Justly Compensated,* 50 Fed. Comms. L.J. 441, 447–49 (1998) (decrying the effects of the broader reading without mentioning the syntactically more plausible narrow reading). *But see AT & T Communications,* 8 F.Supp.2d at 587 (adopting narrow reading without discussion).

Cablevision's reading of § 253(c) is not frivolous. But once again, we choose to set aside a difficult interpretative question when the answer to that question is not dispositive of the appeal. We will assume *arguendo* that the phrase "competitively neutral and nondiscriminatory" in § 253(c) refers to the City's management of its rights of way [12] and focus our analysis on the interpretation of that phrase.

**12.** There is an important difference between this assumption and the assumption made by the district court. The district court assumed *arguendo* that § 253(c) requires the City to be nondiscriminatory in the management of its rights of way, while rejecting entirely the argument that § 253(c) requires management decisions to be competitively neutral. *See Cablevision,* 38 F.Supp.2d at 58–59. The court gave two reasons for distinguishing the terms "competitively neutral" and "nondiscriminatory," neither of which is persuasive. First, the court noted that "[a] requirement of nondiscrimination ... appears two times in § 253(c)." *Id.* at 59. This is simply irrelevant, since the second occurrence of the term "nondiscriminatory" in § 253(c) clearly refers only to compensation schemes. Second, the court observed that "Congress would have had a logical basis for making this distinction" between a competitive neutrality and a nondiscrimination requirement, since "those responsible for the management of public rights of way are likely ... to be engineers," who are "not experts on the effects that their actions may have on competition." *Id.* Re-

### C. Managing Rights of Way "on a Competitively Neutral and Nondiscriminatory Basis"

The critical issue for our purposes—and the point on which the parties actually disagree [13]—is whether the City has violated any obligation under § 253(c) to manage its public rights of way so as to enhance the level of competition in the Boston telecommunications market.

To understand the parties' differing positions on this issue, it is helpful to first consider the many points on which the parties seem to agree. [14]

First, the parties have sensibly centered their arguments on the term "competitively neutral," since Cablevision does not, and could not, seriously dispute the district court's conclusion that the City has managed its rights of way in a nondiscriminatory manner. As long as the City makes distinctions based on valid considerations, it cannot be said to have discriminated against Cablevision in favor of Boston Edison. Here, as the district court points out, those valid considerations are obvious:

> Constructing new conduit requires digging up the City's streets and attendant disruption. Putting new cable in exist-

ing conduit or converting existing cable to new uses does not require digging up streets or disruption. Thus, it is not discrimination for the City to have different policies for the construction of conduit that is new and for the conversion of the uses to which existing conduit can be put.

*Cablevision,* 38 F.Supp.2d at 60.

Second, the parties seem to agree that the City's new oral policy regarding the conversion of cable or conduit complies with § 253(c)'s competitive neutrality requirement, because it results in equivalent notice obligations for all market participants. Assuming that the policy requires Boston Edison [15] to petition for amended grants of location before it converts cable or conduit, competitors receive notice before new cable is pulled through existing conduit (or alternatively, before cable is put to a new use [16]) as well as before new conduit is installed.

Cablevision does make a halfhearted effort to argue that, in order to achieve competitive neutrality, the City's policy on conversions would have to impose requirements identical to those imposed by the City's policy for the construction of new conduit, including the requirement that

gardless of the accuracy of these assumptions, the logic does not seem powerful enough to overcome the plain language of the statute; one could certainly debate, for example, whether discriminatory treatment is intrinsically easier to recognize than a lack of competitive neutrality. In contrast to the district court, we find that the language of § 253(c) permits only an "all or nothing" reading: either both terms apply to management decisions (as we will assume here) or neither does.

13. In their briefs, the private defendants dispute all of Cablevision's legal and factual claims. At oral argument, however, counsel for Boston Edison acknowledged that the private defendants might someday wish to bring their own § 253(c) claims against the City. Given this prospect, they urged, in oral arguments, that Cablevision's § 253(c) claim be resolved on the narrowest possible grounds.

14. We say "seem to agree" because the parties do not stake out clear and consistent positions, necessitating a certain amount of

reading between the lines and harmonization of conflicting arguments.

15. Cablevision objects to the application of the new policy to its own conduit conversions. It argues that it should not be required to apply for amended grants of location when it adds cable for broadband telecommunications to its existing conduit, since it is already authorized to engage in the broadband business by virtue of its franchise agreement. But this argument has no bearing on the question whether the district court's denial of the preliminary injunction motion should be overturned, since the injunction would affect only the City's treatment of the private defendants, not its treatment of Cablevision.

16. We ignore any possible implications of this ambiguity in the City's oral policy, since the parties do not raise any arguments on this point.

shadow conduit be built alongside any converted cable or conduit. But Cablevision does not insist on this interpretation—perhaps because it so obviously runs counter to Congress's intent in § 253(c) to "allow[ ] [local governments] to preserve the physical integrity of streets and highways." *TCI Cablevision,* 12 F.C.C.R. at ¶ 103.

Instead, Cablevision seems to view the competitive neutrality requirement as limited by an implicit practicability constraint. As Cablevision reads § 253(c), it requires the City to manage its rights of way in order to enhance competitive neutrality—but only to the extent that this goal is practicable for the City. It is clearly not practicable to force those who are merely converting conduit or cable to take the same steps as those installing new conduit, and thus to incur all the same costs, since this could result in significant disruption of Boston's streets.

Perhaps for this reason, Cablevision's interpretation of the competitive neutrality requirement centers on the need to ensure early notice of competitors' activities rather than a need to equalize costs across competitors: in its view, § 253(c) requires the City to use its grants of location process to ensure that telecommunications providers have the maximum information available regarding their competitors' cable networks. Here again, the parties seem to agree. Without explicitly conceding the point, the City seems to assume that it is desirable for local authorities, whether mandated by §. 253(c) or not, to seek to enhance competition among providers by maximizing the sharing of information among them.

■ Thus, while the parties are not in perfect agreement, their only point of fundamental disagreement concerns the burden any § 253(c) competitive neutrality requirement would have imposed during the time period between the enactment of the TCA and the City's adoption of the conduit conversion policy, some two years later. Cablevision argues that the competitive neutrality requirement applied with full force from the moment of the TCA's enactment. The City pleads instead for the application of some sort of grace period that would allow it sufficient time to conform its regulatory scheme to the statute's less than transparent language.

Rather than settling this disagreement, we reject its underlying premise. The disagreement is premised on the idea that Congress intended the phrase "competitively neutral" to place an affirmative obligation on local authorities—an obligation to enact regulations that create effective competition among telecommunications providers. We find this interpretation implausible, on a number of grounds.

Most obvious is the form of § 253(c) itself. If Congress meant to impose an affirmative obligation on local authorities to promulgate regulations to ensure a level playing field among telecommunications providers, it would not be likely to bury that obligation in the middle of a savings clause to a preemption provision.

The legislative history of the statute is also contrary to this interpretation. Although Congress located the phrase "competitively neutral and nondiscriminatory" within a savings clause, there is a fair amount of support for the argument that Congress intended this phrase to impose a negative restriction on local authorities' power to regulate. *See, e.g.,* 141 Cong. Rec. H8460, H8461 (daily ed. Aug. 4, 1995) (discussing the need to ensure that cities' franchise fee schemes treat competitors equally). But there is no evidence to suggest that Congress intended the phrase to impose on local governments an affirmative obligation to enact regulations. If the phrase were meant to impose such an obligation, this point would surely have been mentioned prominently in the legislative history.

Common sense also argues against "affirmative obligation" reading of § 253(c). If Congress directly obligated local authorities to regulate toward certain ends (outside of the context of conditional federal

funding), local authorities would need to keep a constant watch over Congress's activities, so that they could respond in a timely manner with the necessary regulations. This continuing obligation could place a great burden on local resources. The text and legislative history of § 253 show no desire on Congress's part to impose such a burden.

Finally, we note that an affirmative obligation reading of the term "competitively neutral" would raise significant constitutional issues regarding Congress's ability to commandeer local regulatory bodies for federal purposes. *See Printz v. United States,* 521 U.S. 898, 934, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) ("The Federal Government may [not] issue directives requiring the States to address particular problems ...."); *id.* at 961, 117 S.Ct. 2365 (Stevens, J., dissenting) (agreeing that the notion of "cooperative federalism" does not include a direct "mandate to state legislatures to enact new rules"); *id.* at 975, 117 S.Ct. 2365 (Souter, J., dissenting) (agreeing with the majority that "Congress may not require a state legislature to enact a regulatory scheme"). This consideration again makes it unlikely that Congress intended to include such an affirmative obligation in § 253(c).

We conclude that the term "competitively neutral" in § 253(c) imposes—at most— a negative restriction on local authorities' choices regarding the management of their rights of way. This means that the statute would not require local authorities to purposefully seek out opportunities to level the telecommunications playing field. If, however, a local authority decides to regulate for its own reasons (e.g., to minimize disruption to traffic patterns), § 253(c)

would require that it do so in a way that avoids creating unnecessary competitive inequities among telecommunications providers.

■ Cablevision is unlikely to be able to show that the City violated this requirement. As long as the City was uninterested in recording altered uses ·of existing conduit (apparently finding its map of underground Boston adequate without this information), it was under no obligation to record those uses for Cablevision's benefit. Certainly nothing in § 253(c) would have obligated the City to collect and deliver to Cablevision the comprehensive information demanded in Cablevision's proposed preliminary injunction. The City would have been free, under § 253(c), to remain forever uninformed about Boston Edison's conversions.

Once the City concluded that it did want information about altered uses of previously installed conduit and cable, it began collecting that information in a manner that (to all appearances, at least) is competitively neutral. It is easy to imagine a conversion policy that would fail to be competitively neutral—for example, a policy under which only certain applicants were required to file public petitions, while others were allowed to keep their petitions private. But there is no such allegation here.[17]

In the end, Cablevision's TCA claim fails for a simple reason: it is directed at the wrong party. The City is not the cause of any competitive problems faced by Cablevision, and it cannot be commandeered via § 253(c) to solve problems caused by others.[18] In sum, Cablevision's theory fails to

---

**17.** Nonetheless, the oral policy, at least on this record, is in some respects unclear. It would seem advisable for the City to adopt a written policy, if only to reduce the uncertainties that can lead to further litigation.

**18.** The TCA does not leave Cablevision without recourse against Boston Edison, if that company takes unfair advantage of its ownership of a vast network of electrical conduit.

But the TCA's solution to this competitive problem takes a different form than Cablevision supposes: under the Pole Attachments Act, which the TCA amended, a utility is required to "provide a cable television system or any telecommunications carrier with non-discriminatory access to any pole, duct, conduit, or right-of-way owned or controlled by it." 47 U.S.C. § 224; *see also In re Implementation of the Local Competition Provisions*

state a claim on which relief may be granted.

## V. STATE LAW CLAIM

■ Cablevision alleges that the private defendants violated state law by acting unfairly and deceptively in order to gain a business advantage for the Joint Venture. *See* Mass. Gen. Laws ch. 93A, § 2(a) (forbidding "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce"). The district court found that Cablevision was unlikely to prevail on this claim. We agree.

Massachusetts courts read the amorphous language of this statute rather narrowly: in order to violate chapter 93A, "[t]he objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Quaker State Oil Refining Corp. v. Garrity Oil Co.*, 884 F.2d 1510, 1513 (1st Cir.1989) (quoting *Levings v. Forbes & Wallace, Inc.*, 8 Mass.App.Ct. 498, 396 N.E.2d 149, 153 (1979)); *see also Johnson v. Koplovsky Foods, Inc.*, 5 F.Supp.2d 48, 55 (D.Mass. 1998).

The district court was not convinced that the defendants acted with this level of rascality:

> [A]t this point the evidence indicates that the Boston Edison defendants made no misrepresentations to the PIC. The Boston Edison defendants did not violate any agreement with the PIC. The Boston Edison defendants did not violate any policy adopted by the PIC concerning the conversion of existing conduit or cable to telecommunications uses.

*Cablevision*, 38 F.Supp.2d at 61. The court's evaluation of the defendants' behavior was not clearly erroneous; to the contrary, it is well supported by the record.

■■ This conclusion does not end the analysis, though, since one can commit a chapter 93A violation without behaving like a "rascal," if one violates consumer protection or public safety laws. *See PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 321 N.E.2d 915, 917–18 (Mass. 1975); *Piccuirro v. Gaitenby*, 20 Mass. App.Ct. 286, 480 N.E.2d 30, 33–34 (Mass. 1985); Mass. Regs.Code tit. 940, § 3.16 (1978). Cablevision argues that Boston Edison violated two public safety laws, Mass. Gen. Laws ch. 166, §§ 21 and 22, and thus violated chapter 93A as well. We find that Cablevision is not likely to prevail on either point. Regardless of whether these laws qualify as public safety or consumer protection laws, *see* Cablevision, 38 F.Supp.2d at 62 (rejecting this contention), it does not appear that Boston Edison's conversion of cable and conduit violated either § 21 or § 22.

Section 21 provides, in relevant part:

> A company *incorporated for the transmission of intelligence by electricity or by telephone, whether by electricity or otherwise* ... or *for the transmission of electricity for lighting, heating or power,* ... may, under this chapter, construct lines *for such transmission* upon, along, under and across the public ways....

Mass. Gen. Laws. ch. 166, § 21 (emphasis added). Cablevision claims that the emphasized language means that "telecommunications companies can place lines for telecommunications ... and electric com-

---

*in the Telecommunications Act of 1996*, 11 F.C.C.R. 15,499, ¶ 1223 (Aug. 8, 1996) (noting that under § 224 the FCC "expect[s] a utility that receives a legitimate inquiry regarding access to its facilities to make its maps, plats, and other relevant data available for inspection"). Section 224 imposes a duty on utilities similar to the duties imposed by § 251 on incumbent local exchange carriers. *See* 47 U.S.C. § 251(c). In each case, the TCA's solution to the competitive problem posed by existing monopolies is to force those monopolies to provide access to their networks on reasonable, nondiscriminatory terms. *See id.* § 224(b)-(e) (regulating the rates, terms, and conditions of pole attachments); § 252(d) (setting pricing standards for interconnection and network element charges).

panies can place lines for 'transmission of electricity,' but not for any other purpose." This argument is creative, but not convincing. If § 21 is read as a whole, it becomes evident that its purpose is not to control the uses to which different types of companies may put their lines, but rather to specify where those lines may be constructed.

The district court gave a detailed and able analysis of § 22, which need not be repeated here. *See Cablevision,* 38 F.Supp.2d at 61–62. We find that Cablevision is unlikely to prevail on its § 22 claim, because § 22, which was enacted in 1849 and most recently amended in 1925, simply does not speak to the issue of conduit conversion.

## VI. CONCLUSION

"Likelihood of success is the touchstone of the preliminary injunction inquiry." *Philip Morris, Inc., v. Harshbarger,* 159 F.3d 670, 673 (1st Cir.1998). The order of the district court denying the motion for a preliminary injunction is *affirmed.* The district court should consider whether dismissal of this action is warranted in light of this opinion. Costs to appellees.

NOONAN, Circuit Judge, concurring in the result.

On February 8, 1996 the Telecommunications Act of 1996 became law. *See* Pub.L. No. 104–104, 1996 U.S.C.C.A.N. (110 Stat. 56) 161. The act was a major piece of legislation by the 104th Congress. It occupies 105 pages in the *United States Code Congressional and Administrative News,* Vol. I, Laws (1996). It is a comprehensive and intricate piece of legislation. It reflects the input of government regulators, the various industry groups affected, and representatives of consumers and the general public. Inevitably it is a compromise, a work of balancing values. *Cf. Amherst, N.H. v. Omnipoint Communications Enters., Inc.,* 173 F.3d 9, 13 (1st Cir.1999). Where it is silent, it is likely to

be designedly so. *See Stowell v. Ives,* 976 F.2d 65, 70 n. 5 (1st Cir.1992).

The Telecommunications Act in dealing with electronic publishing by the Bell operating companies has a section entitled "Private right of action," providing that any person claiming a violation of the new law on that subject "may file a complaint with the Commission [the Federal Communications Commission] or bring suit as provided in section 207 of this title." 47 U.S.C. § 274(e). The cross-reference to § 207 is to a provision of law preceding the Telecommunications Act that is entitled "Recovery of damages" and declares that any person claiming to be damaged by any common carrier subject to this chapter "may either make complaint to the Commission [the F.C.C.] as hereinafter provided for, or may bring suit for the recovery of the damages ... in any district court of the United States of competent jurisdiction." *Id.* § 207.

Dealing with illegal changes in subscriber carrier selections, the Telecommunications Act provides: "Any telecommunications carrier that violates the verification procedures described in subsection (a) of this section and that collects charges for telephone exchange service or telephone toll service from a subscriber shall be liable to the carrier previously selected ... in accordance with such procedures as the Commission may prescribe. The remedies provided by this subsection are in addition to any other remedies available by law." *Id.* § 258(b).

Referring to the review by state commissions of agreements for interconnection between carriers, the Telecommunications Act states: "In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section." *Id.* § 252(e)(6).

These provisions of law are sufficient to demonstrate beyond doubt or cavil

that when Congress intended in the Telecommunications Act of 1996 to provide a remedy in the federal courts for a violation of the Act it used language apt for that purpose. Congress has not used such language in § 253(c). In the sharpest contrast, the language relied on by Cablevision in seeking access to the federal courts by this suit reads as follows:

> Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

*Id.* § 253(c).

It reads the statute backwards to infer from "Nothing affects the authority ...," the authorization of a private suit objecting to the exercise of that authority. A savings clause is interpreted as a clause permitting the imposition of liability. A safe harbor for state or local managers of public roads is turned into a trap for them and a spring gun for telecommunications providers. The language of § 253(c) is so far from the language Congress used when authorizing such suits that only violent wrenching of the text can serve to squeeze such a sense out of it.

Not only is this squeezing contrary to the plain meaning of the statute, it runs counter to the statutory scheme of § 253 itself. That section begins forthrightly, "No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide interstate or intrastate telecommunications service." *Id.* § 253(a). Subsection (b) then provides that a State may impose certain conditions "on a competitively neutral basis and consistent with section 254 of this section." *Id.* § 253(b). The FCC is given authority by subsection (d) to preempt the enforcement of "any statute, regulation, or

legal requirement that violates subsection (a) or (b)." *Id.* § 253(d).

The statutory scheme is evident: The Commission is to assure that state or local regulation does not frustrate the competitive policies the Act is designed to promote. There is no thought that a separate forum is furnished in the federal district courts. To find such a forum here is to destroy the delicate balance between the federal and the local that the Act has struck. *See Amherst,* 173 F.3d at 13.

Cablevision seeks to tease out of the silence as to the FCC's jurisdiction over subsection (c) an implied right of action in the federal district courts. The silence is easily explained. If any state or local statute, regulation or requirement "has the effect" of prohibiting an entity from providing telecommunications service, subsection (a) is violated and the Commission under subsection (d) has authority to act. There is no need to provide a remedy under subsection (c). If Cablevision has a case for discriminatory, anti-competitive action by the City, subsection (d) has assigned the remedy to the FCC.

Cablevision's only argument to the contrary is as counter-intuitive as its reading of the statute. Cablevision points to a version of the bill that was *not* passed as proof that subsection (c) was meant to afford access to the federal courts!

No circuit court has given heed to this argument. *Abilene, Texas v. F.C.C.,* 164 F.3d 49 (D.C.Cir.1999), is a review of a decision of the Commission. It has nothing to say on the enforcement of § 253(c) except dicta that under both (b) and (c) there is "a large regulatory territory for State authority." *Id.* at 53.

The intent of Congress not to provide a private cause of action, explicitly or implicitly, in § 253(c) is dispositive. *See Touche Ross & Co. v. Redington,* 442 U.S. 560, 578, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). Cablevision has no basis for its suit under § 253(c). There is no occasion to take up the other issues thoughtfully explored by

the opinion of the court. There is no reason to retain the state claim. There is no point in prolonging the possibility that § 253(c) provides a cause of action. There is no need to let the case go on. The district court should be directed to enter judgment for the defendants.